Daniel CONNAUGHTON,
Plaintiff–Appellee,

v.

HARTE HANKS COMMUNICATIONS,
INC., Defendant–Appellant.

No. 86–3170.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 20, 1987.

Decided Jan. 28, 1988.

Rehearing and Rehearing En Banc
Denied April 4, 1988.

---

Richard L. Creighton, Jr. argued, Cincinnati, Ohio, for defendant-appellant.

John A. Lloyd, Jr. argued, Cincinnati, Ohio, for plaintiff-appellee.

Before KEITH, KRUPANSKY and GUY, Circuit Judges.

KRUPANSKY, Circuit Judge.

Appellants challenge this Court to determine the limits of its responsibility to review a jury's verdict against a publisher in this action for libel implicating important First Amendment issues pursuant to the dictates of the Supreme Court mandating appellate courts to conduct an independent examination of the entire record of the proceedings to ensure that the judgment does not pose a forbidden intrusion into First Amendment rights of free expression. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984); *St. Amant v. Thompson,* 390 U.S. 727, 732–33, 88 S.Ct. 1323, 1326–27, 20 L.Ed.2d 262 (1968); *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964).

The gravamen of the assignment imposes the commitment to explore the delicate relationship between First Amendment rights of free expression and the common law protection of an individual's interest in reputation. *Ollman v. Evans,* 750 F.2d 970, 974 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

The threshold to the resolution of the appellant's challenge is complicated by an illusory conflict between equally imposing rules of law. Juxtaposed are the clearly erroneous and due regard standard of appellate review that shall be accorded to the opportunity of the fact-finder to assess the credibility of the witnesses upon direct and cross examination, either the judge in a

bench trial as imposed by Fed.R.Civ.P. 52(a), which dictates that

> [f]indings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses,

or judicial precedent that impresses the identical clearly erroneous and due regard standard of appellate review upon factual findings of a jury, *see, e.g., Strauss v. Stratojac Corp.,* 810 F.2d 679, 685 (7th Cir.1987) ("This court can overrule the jury's determination only if it is clearly erroneous."); *Jefferson Nat'l Bank v. Central Nat'l Bank in Chicago,* 700 F.2d 1143, 1156 (7th Cir.1983) ("[W]e must accept the findings of the jury unless those findings are clearly erroneous."); *accord Manufacturers Hanover Trust v. Drysdale Sec. Corp.,* 801 F.2d 13, 27 n. 8 (2nd Cir.1986) (A jury's "responses to factual interrogatories ... [are] subject to the clearly erroneous rule on appeal...."), *cert. denied sub nom. Arthur Andersen & Co. v. Manufacturers Hanover Trust,* —— U.S. ——, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987)[1], with the Supreme Court's equally decisive command to appellate courts in cases involving considerations of actual malice joining First Amendment issues to "make an independent examination of the whole record" and insure that "the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co. v. Sullivan,* 376 U.S. at 285, 84 S.Ct. at 729 (footnote omitted) (quoting *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)). These rules probe the court's reasoning in its disposition of this appellate review.

Guidance in harmonizing the rules confronting the court in its search for a resolution is afforded by the pronouncements of *Bose Corp.* :

---

1. Given that the clearly erroneous standard of review applies equally to factual findings of a judge in a bench trial or in a jury disposition, *see Strauss v. Stratojac Corp.,* 810 F.2d 679, 685 (7th Cir.1987); *Manufacturers Hanover Trust v. Drysdale Sec. Corp.,* 801 F.2d 13, 27 n. 8 (2nd Cir.1986), *cert. denied sub nom. Arthur Andersen & Co. v. Manufacturers Hanover Trust,* —— U.S. ——, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987), the reasoning and conclusions of the Supreme Court in *Bose* are particularly applicable to the instant case wherein the jury's verdict was accompanied by specific findings of fact.

Our standard of review must be faithful to both Rule 52(a) and the rule of independent review applied in *New York Times Co. v. Sullivan.* The conflict between the two rules is in some respects more apparent than real. The *New York Times* rule emphasizes the need for an appellate court to make an independent examination of the entire record; Rule 52(a) never forbids such an examination, and indeed our seminal decision on the Rule expressly contemplated a review of the entire record, stating that a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court, *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. [364], 395, 68 S.Ct. [525], 542, 92 L.Ed. 746 (1948)]. Moreover, Rule 52(a) commands that "due regard" shall be given to the trial judge's opportunity to observe the demeanor of the witnesses; the constitutionally-based rule of independent review permits this opportunity to be given its due.

*Bose Corp.,* 466 U.S. at 499–500, 104 S.Ct. at 1959 (emphasis added).

Mindful of the dictates of *Bose Corp.* this court's attention is, in the first instance, directed to an examination of the entire record of subsidiary, operative or preliminary facts (hereinafter referred to as the operative facts), however characterized, to determine if the jury's findings were clearly erroneous. The chimera of discord between these respected rules of law emerges from a befitting cyclorama of a political campaign with an uncomplicated scenario that is a model for joining the sensitive constitutional issues presented with clarity and precision.

Daniel Connaughton (Connaughton), the plaintiff-appellee, a highly reputable and respected young attorney in the City of Hamilton, Ohio, a former Hamilton City Prosecutor, Assistant Butler County prosecutor, acting judge of the Municipal Court of Hamilton, Ohio and successful practicing lawyer, filed his declaration of candidacy during February of 1983 for a judgeship on that court to be decided at an election on November 8, 1983. During the time period relevant to this dispute the defendant-appellant, Harte Hanks Communications Inc. (Hanks or Journal), owned and published the *Journal News* (Journal), a daily afternoon newspaper that enjoyed the greatest circulation in the Hamilton, Ohio area. The *Cincinnati Enquirer* (Enquirer), a morning newspaper published in Cincinnati, Ohio, and a successful competitor of the *Journal,* was threatening its circulation in the area. James Dolan (Dolan), who had been the endorsed candidate of the *Journal* prior to his election to his first six-year term of office, was the incumbent judge Connaughton sought to replace at the forthcoming election. Since both candidates were prominent Democrats and no Republican declaration of candidacy had been filed, Connaughton's announcement caused Dolan to file as an Independent to avert a primary election. Without issues, the campaign struggled through the summer doldrums as a typical colorless and uneventful judicial contest with the parties extolling their own qualifications and experience to attract voter support. In September, however, the campaign exploded into the most notorious contest in Butler County.

Background for the probative operative facts which joined the constitutional issues of this case is best presented in a resume of proofs developed by the respective parties during the course of the trial.

■ Plaintiff-appellant, at the outset of his case, conceded that he was a "public figure" as defined in relevant Supreme Court precedent. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344–45, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974); *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Thus, Connaughton was charged with the burden of proving by clear and convincing evidence that the allegedly libelous November 1, 1983 article here in controversy was published with "actual malice,"—that is, "with knowledge that it was false or with reckless disregard of whether it was false or

not." *See New York Times v. Sullivan,* 376 U.S. at 280, 84 S.Ct. at 726.

Briefly summarized, the plaintiff's proof disclosed that for a considerable period of time before Connaughton's announcement of candidacy, unsupported rumors persisted throughout Butler County linking Billy New (New), the Director of Court Services and Chief Administrative Officer for the City of Hamilton Municipal Court, a Dolan appointee, with alleged corrupt practices arising from the administration of his official position. Subsequent to his declaration of candidacy, Connaughton, during the early stages of his campaign, criticized Dolan for the disposition of an inordinately large number of cases in his chambers rather than in open court, as well as for the leniency that Dolan extended in DWI (driving while intoxicated) cases. He at no time alluded to the unsupported rumors of corruption associated with the Hamilton Municipal Court.

On or about September 8, 1983, June Taylor (Taylor), the president of the Southern Ohio chapter of MADD (Mothers Against Drunk Driving), advised Connaughton's wife Martha to contact Patty Stevens (Stevens) who had important information concerning her former husband Jack Schreifer's treatment in the Hamilton Municipal Court which Stevens was desirous of bringing to public attention. On September 15, as a result of Taylor's request, Connaughton's wife visited Stevens at her residence and told her that Connaughton would meet with Stevens if she had information concerning the administration of the court. Stevens gave no indication of her personal involvement and intimate knowledge of New's extensive solicitation and acceptance of bribes. She indicated that she would notify Martha Connaughton in the event that she decided in favor of disclosing her information. On Friday, September 16, Stevens instructed her mother to telephone Connaughton's wife to arrange a meeting with Connaughton after she, Stevens, finished work at 11:00 p.m. that night at which time she would make her information available.

Stevens and her sister, Alice Thompson (Thompson), who volunteered to accompany Stevens, were taken from their mother's home to the Connaughton residence, arriving there at approximately 12:30 a.m. on Saturday, September 17. Connaughton had requested his brother-in-law, Dave Berry (Berry), Ernest Barnes (Barnes), a Hamilton deputy fire chief, Janet Barnes (J. Barnes), Barnes' wife and a former *Journal* employee, and his campaign manager, Joe Cox (Cox), to attend the meeting as witnesses. Connaughton also insisted that the conversations be tape-recorded.

For three and one half hours Stevens related a revealing series of events that occurred over an extended period of time during which she served as an intermediary for New who was soliciting and accepting bribes from individuals for favorably disposing of pending criminal charges against them in Dolan's court. She charged that New often transacted his illegal business in Dolan's chambers and in his presence. Thompson volunteered the lenient treatment she had received from Dolan when she had been represented by Matt Crehan (Crehan), a personal friend and ardent political supporter of the judge who had defended her against charges of assault and shoplifting in Dolan's court. This was her only contribution to the information disclosed at the meeting.

The implications of the Stevens' disclosures stunned Connaughton and confronted him with a dilemma. As a lawyer, he had the ethical and legal responsibility of immediately bringing the alleged criminal acts of magnitude to the attention of the appropriate authorities or suffer the consequence of withholding disclosure until after the November election. Moreover, he had no basis for gauging the credibility of either Stevens or Thompson in his evaluation of their information. After considering his position over the weekend of September 17 and 18, he proceeded to seek advice from the Butler County prosecutor on Monday September 19. The County Prosecutor suggested that the interview tape be processed through the Hamilton Safety Director and Police Department and that a routine investigation be initiated by those

local law enforcement authorities. A polygraph test was arranged for the two women. The results of the test indicated that Stevens was truthful. Thompson refused to undergo the examination.

As rumors of New's corruption became more prevalent, Dolan requested that he resign his post as Director of Court Services. New complied on September 22, 1983. On September 27, after Stevens' credibility had been verified through the polygraph examination, Connaughton delivered the Stevens–Thompson tape to the Hamilton Public Safety Director and Chief of Police and, upon their direction, filed a complaint alleging that New had accepted monies through an intermediary from criminal defendants "for the purpose of disposing of cases in a manner not provided by law." As a result of the ensuing police investigation, both Stevens and Thompson were interviewed by the local law enforcement authorities. New was arrested on October 3 and charged with three counts of bribery. He was subsequently indicted by a Butler County Grand Jury. Dolan indignantly publicly characterized Connaughton's charges against New as "dirty politics."

In response to Dolan's charges of "dirty politics," Connaughton, on October 19, 1983, authored a "letter to the editor" which was published in the *Journal* on October 20. In his letter, Connaughton detailed the manner in which he had received the information which supported his criminal complaint against New and the precautions that he had taken to verify the charges leveled by his informants which resulted in New's arrest on October 3, 1983. He explained how he had consulted the local law enforcement authorities and how he had acted upon their advice.

On October 25, 1983, Dolan conferred with Jim Blount (Blount), Editorial Director of the *Journal* whom he had known for 25–30 years, and informed him that as a result of the criminal complaint filed against New by Connaughton the *Enquirer* was planning to publish an uncomplimentary article concerning his tenure as Judge of the Hamilton Municipal Court. Dolan advised Blount that he was desirous

of discrediting this article with favorable responsive news coverage of his activities. Blount suggested that if Dolan scheduled a news conference to respond to any *Enquirer* story, the *Journal* would assign a reporter to be in attendance.

In its October 27, 1983 morning edition, the *Enquirer* published a front page article about Dolan's court bearing the headline "Judge's Closed–Door Cases Raise Legal Eyebrows." The *Enquirer* article criticized Dolan for engaging in a routine practice of disposing of cases behind closed doors in the absence of the prosecutor. The article detailed "three instances where the practice led to abuse." At trial, Blount reluctantly acknowledged that the *Enquirer*'s October 27, 1983 article was "one of the most spectacular stories" that had ever been written about the Municipal Court and had attracted widespread public notice.

The plaintiff's evidence also developed that prior to the *Enquirer* story of October 27, Blount and Joseph Cocozzo (Cocozzo), the publisher of the *Journal*, had, on or about October 19, conferred with Billy New's defense counsel, Hank Masana (Masana), at Masana's request. Masana had advised Blount and Cocozzo that Thompson wished to reveal various promises Connaughton had made to her and her sister for disclosing unfavorable information about the Hamilton Municipal Court and how he intended to confront Dolan with the Stevens–Thompson tape and force him to resign so that he, Connaughton, could become judge. Masana explained that the meeting was being arranged at the request of Dolan's long time friend, Creton, who incidentally had requested Connaughton to withdraw from the Dolan judicial race to assure Dolan's re-election, and who had also represented Thompson before Dolan on her assault and shoplifting charges. The meeting in Masana's law office coincidentally occurred on October 27, 1983, the same day as the *Enquirer* published its story about the Dolan court. The meeting was attended by Thompson, Masana, Blount, and Pamela Long (Long), a staff reporter for the *Journal*. At the time of the interview, Blount was aware of the background of the arrangements for the

interview and the relationship of the parties. He also knew that Thompson had been subpoenaed to appear as a witness before the Grand Jury. Masana was present during the entire interrogation of Thompson and on a number of occasions refreshed her memory with leading questions and suggestions.

Before Thompson's statements were recorded, the parties had an off-the-record discussion during which Blount and Long assured Thompson that the tape of her accusations would never be made available to anyone, including Connaughton. Under questioning, Thompson related incriminating promises and inducements allegedly made by Connaughton to the sisters during the September 17 meeting at the Connaughton residence while the tape recorder was turned off and at other unrecorded and unwitnessed meetings with the Connaughtons. She charged Connaughton with being a liar who had tricked her and her sister into making their disclosures and asserted that during the first meeting which occurred at the Connaughton home on September 17, 1983, Connaughton had promised the sisters a Florida vacation after the election, an invitation to Cincinnati's Maisonette restaurant, employment in a restaurant or at the court and further guaranteed them absolute anonymity in exchange for unfavorable information about the Hamilton Municipal Court and/or Dolan. Her most damaging accusation was an allegation that Connaughton, after becoming aware of the highly incriminating information, stated that he intended to confront Dolan with the tapes with the threat of making them public if he, Dolan, refused to resign in Connaughton's favor. Her allegations against Connaughton implicated grave ethical breaches as well as serious criminal acts of extortion and suborning perjury.

Connaughton's evidence further disclosed that it was apparent to all present at the Thompson interview that she was in a highly emotional state of agitation and distress, that she was disgruntled and vindictive because she had been subpoenaed to testify before the Grand Jury and because her friends accused her of being a "snitch" and a "rat." She attributed the totality of her predicament to Connaughton whom she charged with lying and breaching his promise to ensure her anonymity. Thompson admitted her criminal background and Blount had an awareness of psychiatric treatment for emotional instability and mental problems that she had received at Hughes Hospital.

Thompson sought to credit her statements through verification by Stevens who would in Thompson's words "tell you about the trips, the dinner at the Maisonette, the jobs and everything. She'll tell you the truth, because they was offered to her too." At trial, however, Stevens denied the promises and accused her sister of lying. During the course of the interview Thompson made two significant statements that reflected upon her credibility. She related how she had advised the *Enquirer* of her charges against Connaughton and that the *Enquirer*, after considering her assertions, refused to print her accusations. She also stated that she had brought her charges of impropriety against Connaughton to the attention of the Hamilton Police who also refused to take action against Connaughton. At the conclusion of Thompson's interview, Blount assigned Long to write a story based upon the Thompson information.

Subsequent to the interview, Blount convened a meeting which was attended by the managing editor Walker, reporter Long, and himself where it was decided that, apart from Long's assignment to "write the story," no further action would be taken until the following afternoon, Friday October 28. Thompson's questionable credibility was discussed. On October 28, at Blount's instruction, the managing editor scheduled a meeting with the city editor, the news editor, Long, and eight or nine reporters. During the course of the meeting, the managing editor assigned the reporters on a one-on-one basis to interview each of the individuals who had been present at the various meetings attended by Stevens and Thompson, including the one at the Connaughton residence on September 17 when the Stevens–Thompson

statements were recorded. The reporters were instructed to conduct an interrogation of the witnesses in accordance with a predetermined list of questions that had been devised by Long and Blount. It is significant to note that no one was assigned to interview the key witness, Stevens, who was present with her sister at each of the meetings where the incriminating Connaughton statements were allegedly made, and who was the single witness who could attest to Thompson's credibility, the extent of her emotional instability, her propensity for lying, and her psychiatric condition and treatment. Blount also decided at that meeting that the assigned interviews were not to commence until the following Monday which was October 31, the day after he published his Sunday column, "Editors Notebook."

Apart from the consistent favorable coverage accorded to Dolan by the *Journal* throughout the campaign as contrasted to the generally unflattering negative coverage accorded Connaughton, it was not until after the October 27 *Enquirer* story and the Thompson interview that an intention of the *Journal* to discredit Connaughton, and through him the *Enquirer*, appeared to materialize.

Mindful of the fact that Blount and the publisher of the *Journal*, Cocozzo, were in possession of the volatile October 27th Thompson tape charging Connaughton with extortion, deception, lying, and general unethical conduct, which Cocozzo recognized and acknowledged to be highly defamatory and damaging to Connaughton personally, professionally, and politically; and mindful of the fact that no one at the *Journal* had made an effort to listen to the Stevens–Thompson tape of September 17, which Blount had described as worthless junk; and that Thompson's credibility was questionable and of concern to Cocozzo, the publisher, Blount, the editorial director, and Walker, the managing editor; and mindful of the fact that, at this juncture of the developments, Thompson's credibility had not been investigated or verified, Blount, in his column "Editor's Notebook" written on or before Saturday October 29 and published on Sunday October 30, disclosed a blueprint from which the jury could have concluded that the *Journal* had by that date already intentionally and irreversibly decided to discredit Connaughton by printing the Thompson charges thereby impugning the *Enquirer* and its image in the Hamilton area to enhance its own, the *Journal's*, circulation at the expense of the *Enquirer*.[2]

2. In pertinent parts, the article read:

> According to our recent observations, most voters consider it a tough decision—and getting tougher.
> Last week's array of charges and counter charges probably has taken some votes from Dolan. But it isn't certain if it has boosted Connaughton's prestige.
>
> \* \* \* \* \* \*
>
> As the heat increases, it also appears most voters want to be sure they will support the most honorable and cleanest candidate, not just the one with the most appealing face, the most familiar name, the most advertising or the most votes.
> As one voter remarked, "I want to be sure that my vote won't be discredited by something that happens after the election is over."
> Another said "I don't mind voting for people I know may lose an election, but I resent voting for a person who I later find has been deceitful or dishonest in campaigning."
>
> \* \* \* \* \* \*
>
> Complicating the campaign are the bribery charges pending against Billy New, a former court employee.

> Of course, it should be emphasized that New hasn't been tried, and that a person is presumed innocent until proven guilty. It also should be stressed that New hasn't been indicted. In fact, his case hasn't been weighed by a grand jury.
> Stories on the Dolan–Connaughton fight in the *Enquirer* last week certainly helped to fuel the fire.
> But in the process, the motives and credibility of the Cincinnati newspaper also are in question.
> Some observers are asking how the *Enquirer* can justify the placement of a story critical of Dolan at the top of page one Thursday morning, Oct. 27, two days after U.S. forces participated in the invasion of Grenada, a day after the legality and necessity of the military action was questioned or condemned by some members of Congress and U.S. allies, and while the nation was still angered by the deaths of more than 225 U.S. Marines in a terrorist explosion last Sunday.
> Judge Dolan suggested an answer when he charged Jim Delaney, an *Enquirer* editor, with threatening a page one smear Thursday morn-

The jury could have concluded that Blount's October 30 Editor's Notebook column, which was headlined "Municipal Court Race Will Have More Than One Loser," was carefully contrived and designed to condition the public to the Thompson charges which were to be published two days later on November 1st. It could have decided that the article was calculated to project the *Journal* in the role of the guardian of the public interest, courageously disclosing Connaughton's "dirty politics" and the cabalistic motives of the *Enquirer* to promote the candidacy of Connaughton by smearing Dolan. The thrust of the article, including the headline, predicted that the election would result in more than one loser; it urged the voters to support "the most honorable and cleanest candidate"; it speculated through the shopworn cliche of quoting a concerned undisclosed source who resented "voting for a person who I later find has been deceitful or dishonest in campaigning," the precise environment and image characterizations the *Journal* article of November 1 would impress upon Connaughton's campaign and his personal, professional and political reputation; it attempted to discredit the *Enquirer* story of October 27, 1983 by reporting a mysterious relationship, rumored to exist between Con-

naughton and "a wealthy, influential link to *Enquirer* decisionmakers," which Blount knew to be untrue because it had been denied during a direct confrontation with Connaughton.[3] Having established a fictitious link between Connaughton and the *Enquirer*, Blount's article questioned the motives and the integrity of the *Enquirer* story of October 27 and through Dolan's words labeled it as a Dolan smear calculated to advance the dirty political campaign waged by Connaughton. The jury could have further concluded from the evidence that the *Journal*'s action after the Thompson October 27 interview was nothing more than a charade to cloak its true motives for publishing its November 1st defamatory story.

Between October 31 and the election, the actions of the *Journal* appeared to implement Blount's prophecies of October 30. Its November 1 article through Thompson's charges branded Connaughton as a liar, an extortionist, an unethical opportunist who was waging the very type of "deceitful" and "dishonest" and generally "dirty" campaign which Blount's anonymous citizens were fearful would result in the election of a person unfit to hold public office.[4]

ing if the judge didn't cooperate with the newspaper and its reporter (Karen Garloch), and if the judge didn't cancel a press conference, open to all media, scheduled for Thursday afternoon.

Also surfacing periodically through the campaign has been the unproven suggestion that the Connaughton forces have a wealthy, influential link to *Enquirer* decision makers.

Meanwhile, the dilemma facing the *Journal News* is what to do about an endorsement in the Dolan–Connaughton race.

Should the newspaper play it safe and skip an endorsement for fear that the post-election disclosures could embarrass or discredit the newspaper?

Or should a *Journal News* editorial simply remind voters, as was mentioned earlier, that everyone is innocent until proven guilty and that, in fact, there are no charges pending against the judge?

But taking a safe self-serving course would be shirking a responsibility held sacred by this newspaper.

The complete Editor's Notebook column of October 30th, designated as Appendix A, is attached to the end of the majority's opinion.

3. The absurdity of Blount's unfounded accusation was clearly reflected by the record and his own statement which capsulized his mindset, during cross-examination in response to the following question:

"Did you do anything to verify whether this was true before you wrote it in this column?", to which he stated:

"The rumor was certainly true. I did not have to verify it. I heard it many times."

4. This court is not suggesting "that a question of actual malice arises 'whenever a libel plaintiff introduces evidence that the newspaper vigorously pursues high-impact stories of alleged wrongdoing.'" *Tavoulareas v. Piro,* 817 F.2d 762, 835 n. 48 (D.C.Cir.1987) (en banc) (McKinnon, J., dissenting) (quoting *id.* at 797 (majority opinion)), *cert. denied,* — U.S. —, 108 S.Ct. 200, 98 L.Ed.2d 151 (1988). Clearly, newspapers may investigate and report about issues relating to hard-fought campaigns and allegations of potential misconduct on the part of candidates. The media should be accorded the widest latitude and freedom to endorse and promote candidates and issues of their choosing as, within their judgment, is warranted.

On Monday, October 31, the *Journal* editors knew that all witnesses to the Connaughton/Stevens/Thompson meetings, without exception, had categorically denied Thompson's allegations. Blount testified that on October 31st, he knew that no one had credited Thompson's charges, however, it was his personal opinion that she was credible because he personally had verified her credibility through Tom Grant (Grant), the *Journal's* reporter assigned to the police beat, whom he had instructed to interview the detectives investigating the New case. He also stated that he had verified her credibility through certain other detectives whose names he could not recall. The evidence disclosed, however, that Grant contradicted Blount's statements and testified that he was never instructed to confirm Thompson's credibility and, in fact, never did so. The extent of his assignment was to determine if the New inquiry was continuing as an ongoing investigation.

On October 31st the *Journal* arranged an interview with Connaughton under the pretext of conducting a final endorsement evaluation. Blount, Cocozzo, and Jeanne Houck (Houck), a reporter, were in attendance when Connaughton and his brother-in-law, Berry, arrived at the offices of the *Journal.* A general discussion ensued during which time Connaughton, in response to questions from Blount and Cocozzo, reviewed the chronology of events that had occurred since September 17. This initial perfunctory interview disclosed no information that was not already within the knowledge of the *Journal.* The conversation was not tape-recorded. During the course of the meeting, Blount received a telephone call subsequent to which he immediately terminated the conference and advised Connaughton and Berry that two of his reporters were desirous of briefly speaking with them. Connaughton and Berry accompanied Blount to the second floor of the building. They were separated at this point with Berry being directed into a room with Laurel Campbell (Campbell), a reporter, while Connaughton and Blount entered the office of the managing editor, Walker. They were joined by Long. Connaughton was not then or thereafter advised of the Thompson accusations of October 27, nor was he permitted to listen to the tape-recording of that interview. A tape recorder was activated and during the early stages of the interrogation Connaughton was asked if he had promised Stevens and Thompson anonymity if they provided him with adverse information about the administration of the Hamilton Municipal Court or Dolan, and if he had promised the women a victory dinner at the Maisonette, jobs in a restaurant or at the courthouse and a Florida vacation. Although Connaughton was surprised at the new line of inquiry, he emphatically denied each of the incidents incorporated into various direct questions. He was asked if he had ever indicated to anyone that he intended to confront Dolan with the Stevens/Thompson tape with the threat of making it public if Dolan refused to resign. Connaughton characterized the accusation as absurd and denied it. Thereafter, he was requested to respond to a series of hypothetical questions which were designed to elicit speculative answers as to the mental and motivational stimuli that

We are not suggesting that there is something wrong with aggressive investigative reporting, especially where public corporations or public officials are involved. The exposure of wrongdoing by individuals, and especially by public individuals, is one of the highest functions of the press in our society. Newspapers provided a vital service by acting as watchdog for the public. This interest is protected by *The New York Times* actual malice standard. It is not further protected by requiring the jury to blind itself to evidence of editorial pressure for sensationalistic stories. *Tavoulareas,* 759 F.2d 90, 121 n. 39 (D.C.Cir. 1985), *rev'd en banc,* 817 F.2d 762 (D.C.Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 200, 98 L.Ed.2d 151 (1988); *accord* 817 F.2d at 796 nn. 49 & 50. These first amendment protections do not, however, imply a license to publish known falsehoods or to ignore elementary precautions which are demonstrative of highly unreasonable conduct that constitutes an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers even under circumstances involving public officials or public figures. Nor is the media immunized from liability for intentionally or recklessly published falsehoods merely because they happen to be reporting about election campaigns or potential political misconduct.

may have prompted a person to infer from his, Connaughton's, remarks at the meeting of September 17th and thereafter between Stevens, Thompson, and Connaughton and others that he was promising the women anonymity, dinner at the Maisonette, employment and a Florida vacation for their information or that it was his intention to blackmail Dolan into resigning so he, Connaughton, could replace him as judge. Connaughton's answers to these questions are a matter of record and when read in context do not support the *Journal*'s conclusions that he admitted to any of the Thompson charges which he had unequivocally denied during the early stages of the interview.[5]

To summarize, by the evening of October 31, the *Journal* knew that the Thompson accusations were by Cocozzo's admissions defamatory. It knew that it was confronted with a serious credibility problem with Thompson. It knew that, without exception, all of the witnesses interviewed by its staff disclaimed Thompson's accusations and discredited her charges. It knew that it had deliberately avoided interviewing Stevens, Thompson's sister, who was the single person that was present at all of the meetings between Connaughton and Thompson, and who was intimately aware of the extent of Thompson's emotional instability, mental problems, and psychiatric treatment. Blount knew that he had not conducted any investigation of Thompson's

credibility within the context of the Connaughton accusations. The *Journal* also knew that Connaughton had denied each of the Thompson allegations when it scheduled what it styled as a prepublication legal conference with its lawyer, James Irwin (Irwin), for 9:00 a.m. on November 1st, the following day.

The meeting was attended by Cocozzo, Blount, Walker, Long and Irwin before the 10:30 a.m. *Journal* deadline. Irwin conceded that he had not listened to the September 17 Stevens/Thompson tape, the October 27 tape of Thompson's accusations, or the Connaughton interview of October 31st. He admitted that he had not been advised that no one at the *Journal* had listened to the September 17 Stevens/Thompson tape; that everyone interviewed, without exception, discredited Thompson's charges and that the *Journal* had no verification or support of Thompson's credibility; and that no one at the *Journal* except Blount and Long knew the content of the Connaughton tape of October 31st. He admitted that although he had not listened to Connaughton's interview of that date he had accepted Blount's assurances that Connaughton had admitted Thompson's charges. He conceded that he was aware of the credibility issue that was presented by Thompson. Irwin testified further that the only documents that he reviewed before approving publication of

---

**5.** The dissent, by characterizing as admissions Connaughton's answers to the *Journal* reporter's hypothetical questions during the interview of October 31st, which questions were calculated to elicit purely speculative answers and conjectures, without considering Connaughton's expressed denials to direct questions concerning Thompson's controversial testimony and her purely subjective understandings of Connaughton's statements, or any of the other evidentiary evaluations of the conflicting testimony, clearly demonstrates the wisdom of the Supreme Court's teachings in *Bose*, which were designed to protect a plaintiff's rights to a jury trial in a defamation case against invasion of the jury's fact-finding perogatives anchored in credibility assessments of witnesses available only to the actual trier of fact.

The instant case affords the perfect vehicle for reflecting the implementation of both case law and Rule 52(a) in assigning deference to a jury's findings of fact unless such findings are clearly

erroneous, because it is a case that requires the factual evaluation of conflicting testimony as to a single issue involving the credibility of witnesses. In sum, in the instant case the jury clearly conveyed its findings in its answers to specific interrogatories by assigning greater credibility to the testimony and evidence of Connaughton and his witnesses than to the evidence and testimony of the defendants' witnesses after having assigned credibility evaluations to those witnesses.

The jury refused to believe the theory of the defense and the testimony of its witnesses. The majority, in its decision, has refrained from invading the province of the fact finder by substituting its interpretations of the testimony and evidence of either party. It has merely attempted to emphasize that the jury's findings as to the operative facts of this case were not clearly erroneous in view of the record taken in its entirety.

the November 1 article were the galley sheets which were presented to him at the beginning of the meeting. He stated that Blount assured him that Thompson was credible, however, Irwin never made inquiry as to the scope or extent of the *Journal*'s investigation into Thompson's credibility as it concerned the Connaughton accusations. He stated that although the article appeared offensive, it was not libelous because it incorporated denials by Connaughton. Although he knew extortion and subornation of perjury were criminal offenses and that the Thompson allegations may have inferred unethical conduct, the proposed article was, at least in his opinion, politically advantageous to Connaughton. He did not, however, explain this conclusion. He conceded further that his approval of the article for publication was primarily premised upon his line by line review of the galley sheets, Blount's unconfirmed personal opinion of Thompson's credibility, and his assurances that Connaughton had admitted the Thompson charges. In any event, within this scenario, the *Journal* published the article.

Connaughton occupied himself during the remainder of the campaign by denying Thompson's incriminating accusations. The *Journal* published his denials which merely emphasized, through repetition, the magnitude of the accusations. Predictably, as a finale to its charade, the *Journal* endorsed Dolan two days before the election.

The results of the election were not surprising. The *Journal*'s endorsed candidate Dolan won. Connaughton lost. The effect of the *Journal*'s campaign upon the circulation of the *Enquirer* was not probed since it was not an issue of this legal action.

■ The *Journal*'s evidence relied primarily upon the testimony of the publisher, management and other personnel, most of whom had already testified as if on cross examination during the plaintiff's presenta-

tion. The thrust of its testimony endeavored to convince the jury that the *Journal* pursued a totally fair and impartial course of conduct throughout the entire campaign, including the critical period between September 17th and the election. It attempted to develop the thoroughness of its investigation and its reliance upon legal advice before publishing the November 1st article about Connaughton. The defendants sought to prove that it implemented established guidelines to ensure accuracy and balance in its article and in verifying the credibility of its sources of information. Defendants contended that at the conclusion of its investigation it was satisfied of Thompson's credibility. They presented evidence that was intended to refute the plaintiff's contention that the *Journal*'s motivation for the November 1st Connaughton article was its competition for circulation with the *Enquirer* within the greater Hamilton market. It affirmatively asserted the plausibility of Thompson's charges that the promises of anonymity, the Maisonette victory dinner, jobs and a Florida vacation, as well as the threat against Dolan, were made by Connaughton and deliberately unrecorded during the September 17 Stevens/Thompson interview and during other unrecorded and/or unwitnessed meetings between Stevens/Thompson and the Connaughtons. The *Journal*, through its witnesses, offered testimony to prove that it had no intention to defame or discredit Connaughton either personally, professionally, or politically and that it had a responsibility to the public to publish the newsworthy Connaughton accusations, together with his denials. It contended that its investigation of Thompson's credibility was more than adequate. The defendants also urged that the article of November 1st was a balanced article in that it carried Connaughton's denials of the Thompson charges, which demonstrated the *Journal*'s fairness and impartiality and a lack of intent to injure Connaughton.[6]

---

**6.** The defendant argued that since it had published a letter from plaintiff responding to one of defendant's earlier articles, it had therefore reported this case in a balanced and neutral manner, and thus could not be found to have acted with actual malice. However, it is clear that "mere publication of a denial by the defamed subject does not absolve a defendant

The defendants' evidence came to a dramatic conclusion when defense counsel requested an in-chambers conference with the court and plaintiff's counsel where it was announced that on the previous evening defendants' counsel received a telephone call from Stevens requesting a meeting. Defense counsel advised the court that Stevens had signed an affidavit wherein she attested to a conversation with Connaughton on the previous Tuesday while driving to the courthouse, during which she suggested to Connaughton that her friends had urged that she was entitled to receive at least 10% of whatever recovery resulted from the lawsuit. She stated that Connaughton offered to "take care of her and all of his friends" and that she should continue to stand by her story. Defense counsel also indicated that the affidavit stated that her sister's charges against Connaughton were true. Defendants' counsel advised the court that the Stevens affidavit was being placed before the court and plaintiff's counsel to afford the plaintiff an opportunity to dismiss the lawsuit.

Needless to say, the court and plaintiff's counsel were stunned by the revelation. Plaintiff's counsel conferred with his client and advised the court that his client insisted upon proceeding with the trial. The court refused plaintiff's counsel the right to privately confer with Stevens before she was presented as a witness.

Stevens was recalled by the defense as if on cross examination and testified in accordance with the defendants' in-chambers disclosures. At the conclusion of the defendants' cross examination of Stevens, plaintiff's counsel was permitted further direct examination but was foreclosed from leading the witness. Plaintiff's counsel developed that Stevens had, in fact, been urged by her sister and mother to seek 10% of any recovery. Stevens further testified that on the previous night she had learned from another of her sisters that Thompson and her mother were to be witnesses before the jury and that both of them would lie by testifying to an alleged written promise by Connaughton to pay Stevens 10% of any recovery that he would receive as a result of his lawsuit if she continued to support him by disclaiming Thompson's accusations. She testified further that she did not wish to have her sister and mother criminally involved as a result of lying under oath and was troubled by the antagonism displayed against her by her mother and sister and was not desirous of further aggravating the widening rift between them. Upon further examination, she admitted that Connaughton had never offered her any money; that her affidavit was untrue and that she had testified truthfully during her first appearance when she discredited her sister's accusations against Connaughton.

In sum, she recanted her affidavit to the defendants.

Connaughton on rebuttal supported her testimony and disclaimed any offer of money or other consideration for her testimony.

On this note, the evidence concluded and the case was submitted to the jury upon the court's instruction. As a part of its comprehensive instruction, the court advised the jury that the burden rested upon the plaintiff to prove the element of actual

---

from liability for publishing knowing or reckless falsehoods." *Tavoulareas,* 759 F.2d at 133. The fact that defendant published plaintiff's denial of inferences contained in its articles is not dispositive of whether defendant printed the falsehoods with actual malice.

> The fact that [defendant] published [plaintiff's] denial ... does not in any way vitiate the value of the evidence that [defendant] published the charge with reckless disregard for truth or falsity.... Surely the First Amendment does not prevent a finding of actual malice whenever a defendant publishes false defamatory statements accompanied by denials.

*Tavoulareas,* 817 F.2d at 831 n. 42 (McKinnon, J., dissenting).

Furthermore, printing a denial of accusations made in an article does not necessarily insulate a newspaper from liability since it fails to correct the damage already done by the dissemination of the falsehood. *Tavoulareas,* 817 F.2d at 839 (McKinnon, J., dissenting) ("[Merely printing a denial] falls far short of redeeming a pattern of behavior that displays, clearly and convincingly, a reckless disregard for truth or falsity.").

malice by clear and convincing evidence and thereafter concisely and in simple terms defined the phrase "clear and convincing evidence." At the conclusion of its deliberations, the jury returned a verdict in favor of the plaintiff Connaughton and awarded damages in the amount of $200,-000. In conjunction with its verdict, the jury, in answer to special written interrogatories, concluded (1) that the November 1, 1983 front page article was defamatory; (2) that the article was false; (3) that the article had been published with actual malice.

The defendant Hanks–Journal filed a motion for judgment notwithstanding the verdict (j.n.o.v.) which the district court denied upon a finding that "a properly impaneled jury, correctly instructed, awarded a verdict against Defendant that is supportable from the evidence adduced."

In *New York Times* and *Gertz*, the Supreme Court enunciated the burden of proof imposed upon a public figure in pursuing a claim of defamatory falsehood as "actual malice" established by clear and convincing evidence that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard for the truth. Justice Harlan's opinion in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 153, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967) observed that public figures "were permitted to recover in libel only when they could prove that the publication involved was deliberately falsified, or published recklessly despite the publisher's awareness of probable falsity. Investigatory failures alone were held insufficient to satisfy this standard."

The year following the *Butts* decision, the Supreme Court in *St. Amant v. Thompson*, 390 U.S. at 732, 88 S.Ct. at 1326 declared that the "finder of fact must determine whether the publication was in-

deed made in good faith." The court proceeded to elaborate by explaining that sufficient proof must support the conclusion that the defendant in fact entertained serious doubts as to the truth of its publication and that

> [p]rofessions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. *Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.*

*Id.* (emphasis added) (footnote omitted). The Court emphasized that malice depended upon a showing that the defendant acted with improper motive—an evidentiary subjective pursuit calculated to probe the defendant's state of mind in an effort to disclose the intent or purpose for the publication which, in turn, depended squarely upon credibility assessments best determined by a jury as ultimate factfinders after visually observing the witnesses upon direct and cross examination and evaluating their manner of testifying, the reasonableness and probability of their testimony, the accuracy of their memory, the opportunity they had to see, hear, and know the things about which they testified, their candor and lack of candor, their interest and bias, if any, together with all other circumstances surrounding their testimony.[7]

The instant case did not present multifaceted possibilities of interpretation that "bristled with ambiguity." The core issue was simply one of credibility to be attached

---

7. The Supreme Court has recently reaffirmed the principle that in a libel action, credibility is a factual assessment to be made by the jury, and not the judge.

> Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury.... Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

to the witnesses appearing on behalf of the respective parties and the reasonableness and probability assigned to their testimony.

The wide disparity between the proof of the plaintiff and the defendants in this case demonstrated with clarity that the jury verdict was firmly if not exclusively anchored in credibility evaluations and assessments. If the jury had credited the defendants' evidence, it would have concluded that the *Journal* was not motivated to publish the November 1 front page article by a desire to promote Dolan as its candidate for the Hamilton Municipal Court judgeship by discrediting Connaughton and thereby indirectly discrediting the *Enquirer* for competitive reasons. It could have easily concluded that Thompson's charges were true and/or that the *Journal*'s conduct in determining Thompson's credibility was not a highly unreasonable departure from the standards of investigation and reporting ordinarily adhered to by reasonable publishers. *Curtis Publishing Co.*, 388 U.S. at 155, 87 S.Ct. at 1991. From its written answers to the three special interrogatories attached to its verdict, it obviously elected to assign greater credibility to the plaintiff's witnesses and proof. In sum, the jury simply did not believe the defendants' witnesses, its evidentiary presentations or its arguments.

 It is apparent from the jury's answer to the first interrogatory that it adopted the plaintiff's proof and Cocozzo's admission in deciding that the *Journal*'s November 1st front page article was defamatory. Mindful of the generally accepted rule that false statements do not constitute actionable defamation merely because they are false and that the burden of proof rested upon the plaintiff to demonstrate that the publication was, in fact, defamatory because it tended to injure plaintiff in his trade, profession, or community standing, or lower him in the estimation of the community, or subject him to scorn, ridicule, shame, contempt, or embarrassment,

see *Afro–American Publishing Co. v. Jaffe*, 366 F.2d 649, 654 (D.C.Cir.1966), this court seeks direction from the pronouncements of *Washington Post Co. v. Chaloner*, 250 U.S. 290, 293, 39 S.Ct. 448, 448, 63 L.Ed. 987 (1919) (quoting *Commercial Publishing Co. v. Smith*, 149 F. 704, 706 (6th Cir.1907)), wherein the Supreme Court instructed that a "publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it." [8] Implicit in the Court's admonition is the direction to judge not only the plain text of the publication, but also the composition of the story; its syntex and context; its timing; the prominence the article is accorded by its placement in the paper; the neutral, positive or negative thrust of the article; material factual omissions or distortions; the image of the subject that the publication seeks to project and all other facts that may reflect upon the publisher's intent and purpose to publicly disseminate the information of the article in controversy. Other factors to be scrutinized are conversations between the editor and/or other management personnel with reporters, or the author of the article, concerning the research and development of a controversial story; decisions and reasons relating to selective interviews and selective investigations; the manner of implementing interviews; the importance and veracity of information relied upon in developing the article, always mindful of the caveat that the words of the publication should not be considered in isolation, but rather within the context of the entire article and the thoughts that the article through its structural implications and connotations is calculated to convey to the reader to whom it is addressed.

Considering the November 1st publication in its entirety against the standards enunciated by the Supreme Court, the article was defamatory in its implication that Connaughton was an unethical lawyer and

---

8. In *Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir. 1987) (en banc), *cert. denied*, — U.S. —, 108 S.Ct. 200, 98 L.Ed.2d 151 (1988), the District of Columbia Circuit purported to apply this standard. *See, e.g.,* 817 F.2d at 775, 780 n. 19.

However, it would appear that the court in fact ignored the standard and instead elected to selectively re-examine the evidence to arrive at what *the court itself* thought would be a more reasonable interpretation of the facts.

an undesirable candidate for the Hamilton Municipal judgeship who was capable of extortion, who was a liar and an opportunist not fit to hold public office, particularly, a judgeship. Accordingly, this court concludes that the jury's findings of the operational facts as they bear upon the defamatory character of the article here in issue were not clearly erroneous.

Equally apparent from the jury's answer to the second special interrogatory is that it considered the published Thompson charges to be false. Its finding is understandable in light of the plaintiff's proof which disclosed that the *Journal*'s effort to verify her credibility ended in an avalanche of denials by knowledgeable individuals; its inability to produce a single person who supported Thompson's accusations and its apparent decision to deliberately avoid interviewing Stevens.

Moreover, the jury obviously refused to credit the *Journal*'s construction of Connaughton's interview of October 31. It accepted Connaughton's express denials of each Thompson charge and considered the significant language interpreted by the *Journal* to constitute his admissions of those charges, when read in context, as nothing more than conjecture elicited by structured questions calculated to evoke speculation. Thus, upon reviewing the record in its entirety, this court concludes that the jury's determinations of the operational facts bearing upon the falsity of the article in issue were not clearly erroneous.

Before addressing the perplexing issue of "actual malice" as it impacts this action, it would, at this juncture of this appellate review, be appropriate for this court to reflect upon the teachings of the Supreme Court in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949. Certiorari was granted in *Bose* "to consider whether the court of appeals erred when it refused to apply the clearly-erroneous standard of Rule 52(a) to the district court's 'finding' of malice." *Id.* at

493, 104 S.Ct. at 1955. The court affirmed the First Circuit's reasoning:

> that [the first circuit's] review of the "actual malice" determination was not "limited" to the clearly-erroneous standard of Rule 52(a); instead, it stated that it "must perform a de novo review, independently examining the record to ensure that the district court has applied properly the governing constitutional law and that the plaintiff had indeed satisfied its burden of proof." It added, however, that it "[was] in no position to consider the credibility of witnesses and must leave questions of demeanor to the trier of fact."

*Id.* at 492, 104 S.Ct. at 1955 (quoting *Bose*, 692 F.2d 189, 195 (1st Cir.1982)).[9]

Unfortunately, *Bose* did not explain the scope of its articulated "de novo review," or the extent of "the independent appellate review" and/or the "independent judgment" to be exercised by appellate judges to determine, on an ad hoc basis, if the record on review proves actual malice with convincing clarity. Nor did the decision afford guidance to reviewing courts in resolving the treatment to be accorded factual findings inextricably rooted in credibility assessments resulting from visual observations of a factfinder, either court or jury, manifested during direct or indirect examination of witnesses.

In probing the intent of *Bose*, this court's attention is, in the first instance, attracted to the opinion's discussion of the distinction between the terms "subsidiary facts" and "ultimate fact" and the terms "purely factual findings" and "ultimate factual findings." The "subsidiary facts" alluded to are apparently operative facts that are probative of the background and circumstances which join the substantive issues of the litigation which are developed by testimony of witnesses and other evidence before the factfinder, either court or jury, and which

---

**9.** The clearly erroneous standard of Rule 52(a) is equally applicable to a jury's factual findings. *See Strauss v. Stratojac Corp.*, 810 F.2d 679, 685 (7th Cir.1987); *Manufacturers Hanover Trust v. Drysdale Sec. Corp.*, 801 F.2d 13, 27 n. 8 (2nd Cir.1986), *cert. denied sub nom. Arthur Andersen & Co. v. Manufacturers Hanover Trust*, — U.S. —, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Jefferson Nat'l Bank v. Central Nat'l Bank in Chicago*, 700 F.2d 1143, 1156 (7th Cir.1983).

invoke credibility assessments and determinations.

In contrast, "ultimate facts" or conclusions are defined as those which "more clearly impl[y] the application of standards of law." *Bose*, 466 U.S. at 500 n. 16, 104 S.Ct. at 1959 n. 16. Simply stated, *Bose* distinguished between questions of fact to be resolved by the factfinder, either the court or the jury, applying credibility assessments which come within the purview of the clearly erroneous standard of review and questions of law to be decided by the court.

The *Bose* court framed the issue before it in the following terms:

> The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, *must independently decide whether the evidence in the record is sufficient* to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

*Id.* at 511, 104 S.Ct. at 1965 (emphasis added).

■ Thus, in determining the issue of "actual malice" within the context of the libel case at bar, this court is called upon to determine if it should apply its independent judgment to each of the subsidiary facts, more appropriately characterized as operative facts, without benefit of credibility assessments, which are probative of the ultimate fact or ultimate dispositive conclusion of actual malice or if it should limit the exercise of its independent judgment to reviewing the jury's factual findings to determine if the totality of those factual findings reflected by the entire record, as a matter of law, support the jury's ultimate conclusion of clear and convincing proof of actual malice.

Logic and reason dictate that the *Bose* directed de novo review did not apply to preliminary, operative, or subsidiary factual determinations anchored in credibility determinations but rather was limited to a review of the ultimate conclusion of clear and convincing proof of actual malice. A contrary conclusion would usurp the role of the jury and burden the appellate courts with original jurisdiction in libel actions impinging a plaintiff's constitutional right to a jury trial.[10]

The Court of Appeals for the Ninth Circuit in *Guam* directly addressed the manner in which the preliminary facts should be judged to determine if the ultimate conclusion of actual malice is supported by clear and convincing proof. *Guam Fed'n of Teachers, Local 1581 v. Ysrael*, 492 F.2d 438, 441 (9th Cir.), *cert. denied*, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). The court concluded that upon appeal a jury finding resolving the conflicting subsidiary or operative facts should be judged by the same rules and accorded the same deference as motions for j.n.o.v., directed verdict or other summary dispositions.[11] The court stated:

---

**10.** The rationale of the *Tavoulareas* en banc majority has placed it squarely in the paradoxical position of discarding jury trials in actions for libel thereby denying the plaintiff of his Seventh Amendment right to trial by jury.

**11.** The majority *Tavoulareas* en banc opinion appears to have evaded the core issue presented by the appeal and refused to address or decide the judicial deference to be accorded a jury's resolution of conflicting facts and credibility assessments.

Mindful of the fact that the appeal resulted from the trial court's grant of j.n.o.v. from a jury verdict in favor of plaintiff, the en banc court afforded no recognition of rudimentary principles applicable to appellate review of summary dispositions. It judged the credibility of witnesses without the opportunity of visual observations, it evaluated both the credibility and weight of the evidence, and denied the plaintiff his entitlement to have the evidence along with all inferences reasonably drawn therefrom to be viewed in the light most favorable to the plaintiff. The opinion appears to have accorded no deference to the pronouncements of the Supreme Court addressing issues of defamation, falsity, and malice enunciated in *New York Times v. Sullivan* and its progeny; *St. Amant v. Thompson; Curtis v. Butts; Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949; and other milestone decisions that have, over the years, addressed those keystone issues. In sum, the en banc court appears to have intruded into the original jurisdiction of a trial court jury.

[I]n a libel case, as in other cases, the party against whom ... a motion for a judgment notwithstanding the verdict is made is entitled to have the evidence viewed in the light most favorable to him and to all inferences that can properly be drawn in his favor by the trier of fact. We think, too, that in such cases it is not only not the duty of the judge, or this court of appeals, to weigh the credibility of the evidence, or to draw inferences in favor of the moving party (except, of course, when no contrary inference can legitimately be drawn) but that *neither the judge nor this court on appeal has the authority to weigh credibility or to choose among legitimate inferences in such cases.*

*Guam Fed'n of Teachers, Local 1581 v. Ysrael,* 492 F.2d 438, 441 (9th Cir.), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed. 2d 111 (1974) (emphasis added). The analogy should stimulate little, if any, controversy. In any event, this court subscribes to the logic of the analysis.

The same court elaborated on its previous observations during the following year in *Alioto v. Cowles Communications, Inc.,* 519 F.2d 777, 780 (9th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975):

A district judge on motion for judgment n.o.v., or an appellate judge on review, must examine the evidence to see whether, if all permissible inferences were drawn in the plaintiff's favor and all questions of credibility were resolved in his behalf, the evidence then would demonstrate by clear and convincing proof that the libelous material was published with actual malice.

In turning to the consideration of actual malice in the instant case, this court must, from an examination of the record, first determine if the jury's resolution of the subsidiary or operative facts was clearly erroneous; that is, if, after reviewing the entire evidence, the reviewing court was left with the definite firm conviction that a mistake had been made. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

A review of the entire record of the instant case disclosed substantial probative evidence from which a jury could have concluded (1) that the *Journal* was singularly biased in favor of Dolan and prejudiced against Connaughton as evidenced by the confidential personal relationship that existed between Dolan and Blount, the *Journal* Editorial Director, and the unqualified, consistently favorable editorial and daily news coverage received by Dolon from the *Journal* as compared with the equally consistently unfavorable news coverage afforded Connaughton; (2) that the *Journal* was engaged in a bitter rivalry with the *Cincinnati Enquirer* for domination of the greater Hamilton circulation market as evidenced by Blount's vituperous public statements and criticism of the *Enquirer*; (3) that the *Enquirer's* initial expose of the questionable operation of the Dolan court was a high profile news attraction of great public interest and notoriety that had "scooped" the *Journal* and by Blount's own admission was the most significant story impacting the Connaughton–Dolan campaign, (4) that by discrediting Connaughton the *Journal* was effectively impugning the *Enquirer* thereby undermining its market share of the Hamilton area; (5) that Thompson's emotional instability coupled with her obviously vindictive and antagonistic attitudes toward Connaughton as displayed during an interview on October 27, 1983, arranged by Billy New's defense attorney, afforded the *Journal* an ideal vehicle to accomplish its objectives; (6) that the *Journal* was aware of Thompson's prior criminal convictions and reported psychological infirmities and the treatment she had received for her mental condition; (7) that every witness interviewed by *Journal* reporters discredited Thompson's accusations; (8) that the *Journal* intentionally avoided interviewing Stephens between October 27, 1983, the date of its initial meeting with Thompson, and November 1, 1983 when it printed its first story even though it knew that Stephens could either credit or discredit Thompson's statements; (9) that the *Journal* knew that publication of Thompson's allegations charging Connaughton with unethical conduct and crimi-

nal extortion and her other equally damaging statements would completely discredit and irreparably damage Connaughton personally, professionally and politically; (10) that its prepublication legal review was a sham; (11) that the *Journal* timed the release of the initial story so as to accommodate follow-up stories and editorial comments in a manner calculated to peak immediately before the election in an effort to maximize the effect of its campaign to discredit Connaughton and the *Enquirer.*

Having considered the subsidiary or operative facts as reflected in the entire record of the evidence and assigning "due regard" to the jury's opportunity to observe the demeanor of the witnesses, and mindful of the trial court's model instruction to the jury advising it that the burden rested upon the plaintiff to prove the element of actual malice by clear and convincing evidence coupled with the clear, concise and simple definition of that term incorporated into the instructions, this reviewing court is unable to conclude that it "is left with a definite and firm conviction that a mistake has been committed" by the jury in arriving at its subsidiary factual findings. *United States v. United States Gypum Co.,* 333 U.S. at 395, 68 S.Ct. at 542. Accordingly this court concludes that the jury's finding of the operative facts as reflected by the entire record of the evidence are not clearly erroneous.

Having decided that the jury's findings were not clearly erroneous, this appellate review proceeds to implement the teachings of *New York Times v. Sullivan* and *Bose Corp. v. Consumers Union of United States, Inc.* by conducting its independent review of the entire record to correct errors of law, including those that may have infected so called mixed findings of law and fact, or findings of fact that are predicated on a misunderstanding of a governing rule of law, if any exist, and to determine the ultimate conclusion of federal constitutional law, namely, whether the evidence reflected by the entire record in this defamation action is of the *convincing clarity* required to strip the publisher of First Amendment protection.

The Supreme Court in *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) charted this court's course to resolution of its quest in the following passage:

Spreading false information in and of itself carries no First Amendment credentials. "[T]here is no constitutional value in false statements of fact."

\* \* \* \* \* \*

Those who publish defamatory falsehoods with the requisite culpability, however, are subject to liability, the aim being not only to compensate for injury but also to deter publication of unprotected material threatening injury to individual reputation. Permitting plaintiffs such as Herbert to prove their cases by direct as well as indirect evidence is consistent with the balance struck by our prior decisions. If such proof results in liability for damages which in turn discourages the publication of erroneous information known to be false or probably false, this is no more than what our cases contemplate and does not abridge either freedom of speech or of the press.

*Lando,* 441 U.S. at 171–72, 99 S.Ct. at 1646 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed. 2d 789 (1974)).

█ Apparent from the above language, a plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence.

█ Appreciative of the antithesis between freedom of speech and the elements of libel, which limit a publisher's freedom to express certain sentiments, at least, without guaranteeing some legal proof of their accuracy this court is, nevertheless, legally committed to existing legal precedent that, in cases involving materials and persons commanding justified and important interest, a finding of falsity alone will not and should not strip the publisher of First Amendment protections. *Curtis Publishing Co. v. Butts,* 388 U.S. at 152, 87 S.Ct. at 1990.

In the instant case it is conceded that although not a public official, Connaughton

was a public figure. Aware of this concession, this court's attention is directed to the expressions addressing the rigorous constitutional requirements appropriate to accommodate the conflicting interests between freedom of press and defamation.

In *Curtis Publishing Co. v. Butts*, the Supreme Court accorded public figures as well as public officials recovery of damages for the publication of "defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." 388 U.S. at 155, 87 S.Ct. at 1991.

Adopting the premises that *Bose* mandated an independent appellate review of the jury's findings resolving the ultimate fact or conclusion of "actual malice" but did not require a de novo assessment of each and every subsidiary or operative fact which supported the factfinder's disposition of the constitutional issue; and this court, having accepted the jury's findings of the subsidiary or operative facts that bear upon the issue of "actual malice" as those facts are mirrored by the record in its entirety; and having evaluated those factual findings and all reasonable inferences arising therefrom, including assessments of credibility in favor of the plaintiff, this appellate review undertakes an overview or "second look" of the entire record preliminary to the exercise of its independent judgment to determine if the proof as found by the jury supporting "actual malice" is, as a matter of law, convincingly clear.

■ Thus, for liability to attach in an action for libel, the alleged defamer of a public figure must know or have reason to suspect that its publication is false. *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) advises that "[u]nder this rule, absent knowing falsehood, liability requires proof of reckless disregard for the truth, that is, that the defendant 'in fact entertained serious doubts as to the truth of his publication.' * * * * Such 'subjective awareness of probable falsity'

* * * may be found if 'there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports' * * * or 'equally significant, to prefer the veracity of one source over another.'" *Id.* at 156–57, 99 S.Ct. at 1639 (citations omitted); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 n. 6, 94 S.Ct. 2997, 3004 n. 6, 41 L.Ed.2d 789 (1974); *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). *Lando* also affords guidance in identifying the type of substantive evidence that offers assistance to a reviewing court in exercising its independent judgment to determine if the evidence bearing upon the constitutional issue of actual malice is sufficiently clear and convincing to support the verdict. *Lando*, 441 U.S. at 160 n. 6, 99 S.Ct. at 1641 n. 6. In *Lando*, the Court teaches that the presence or absence of motive and/or other circumstances as heretofore discussed for publication of the article may reflect upon the publisher's intent and purpose to publicly disseminate the article in controversy.

■ Because of the striking factual similarity between the instant case and *Curtis Publishing Co. v. Butts*, this court's mission is, to a degree, simplified. In *Butts*, the Saturday Evening Post (Post) published a defamatory article which accused Wallace Butts, a highly respected athletic director and former coach at the University of Georgia and a nationally recognized figure in coaching ranks, of conspiring to "fix" a football game between the University of Georgia and the University of Alabama played in 1962. As in the instant case, the Post in *Curtis* was confronted with a highly questionable primary information source named Burnett, who was on probation in connection with bad check charges, and whose credibility was a serious issue. The Post, although recognizing the need for a thorough investigation of the charges against Butts, ignored elementary precautions inherent to standards of investigation and reporting ordinarily adhered to by responsible publications, and published the Butts article on the

basis of Burnett's affidavit without substantial independent support.

As in *Curtis*, the Connaughton front page story of November 1st was not "hot news" in that it necessitated meeting a publication deadline. Publication could have been withheld until a later date to accommodate a thorough investigation of credibility implications of the magnitude presented by Thompson's accusations which were of conspicuous concern to Cocozzo, the publisher, Blount, the editorial director, and Walker, the editor of the *Journal*, unless of course the November 1st publication date was critical to the timing of the *Journal's* campaign to further the election of its candidate Dolan by discrediting Connaughton before the forthcoming election and thereby fortifying its reputation within its circulation area as the dominant respected and influential image maker to the detriment of the *Enquirer*. As in *Curtis*, wherein the Post was anxious to change its image by instituting a policy of "sophisticated muckraking" in an effort to become more competitive in order to enhance its circulation, in the present case, the jury could have found that the *Journal* was motivated to publish the controversial article by its efforts to establish its preeminence in reporting political news in order to further its competitive position vis-a-vis the *Enquirer* in the greater Hamilton County geographical area through the advancement of Dolan's candidacy. As in *Curtis*, confronted with vital concerns about the credibility of its sole information source, the *Journal* ignored elementary precautions and demonstrated highly unreasonable conduct which constituted an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers by the publication of the November 1st article based solely upon the Thompson statements without substantial independent support.

Having considered the evidence bearing on the subsidiary factual issues in the light most favorable to the jury findings and having defined and considered the subsidiary facts developed by the probative evidence adduced at trial, this court in the exercise of its independent judgment determines that the probative facts considered cumulatively are clear and convincing in nature, and therefore are legally sufficient to support the jury's resolution of the dispositive conclusions as reflected in its special verdict. Weighing the cumulative impact of the subsidiary facts enumerated above, this court concludes that Connaughton proved, by clear and convincing evidence, that the *Journal* demonstrated its actual malice when it published the November 1, 1983 article despite the existence of serious doubt which attached to Thompson's veracity and the accuracy of her reports. *See St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968).

"It is well established that evidence that a publisher failed to investigate does not, *by itself*, prove actual malice." *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir.1983) (emphasis added) (citing *St. Amant*, 390 U.S. at 732–33, 88 S.Ct. at 1326); *see also Schultz v. Newsweek, Inc.*, 668 F.2d 911, 918 (6th Cir.1982). Although the *Journal* attempted to characterize its failure to contact Stephens as an act of negligence that was insufficient to establish actual malice, its failure to interview her must be considered in conjunction with other direct and circumstantial evidence bearing on the issue of "actual malice." As previously discussed herein, the evidence adduced at trial demonstrated that the *Journal* was motivated to publicize Thompson's allegations, not only by a desire to establish its preeminence in the reporting of Hamilton political news, but also by a desire to aid the Dolan campaign. Prior to publishing the November 1, 1983 article, the *Journal* was aware that Thompson had been antagonized by the public notoriety of her involvement in the New bribery controversy and had been reproached by her peers as a "snitch" and a "rat," all of which she resented and attributed to Connaughton; that Thompson had a history of emotional and psychiatric instabilities for which she had been treated professionally; that her allegations had been discredited by every witness to the September 17, 1983 and subsequent meetings who had been

contacted by the newspaper's staff; that the *Journal* had no independent affirmative support for her accusations; and that Stevens as the key witness to New's indictment could either have credited or discredited her sister's statements and could have attested to her emotional and psychiatric instability and professional treatment; nevertheless, it published the November 1 article. Accordingly, this court concludes that the *Journal's* decision to rely on Thompson's highly questionable and condemning allegations without first verifying those accusations through her sister, Stevens, and without independent supporting evidence constituted an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers which demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of "actual malice" as found by the jury. *Butts,* 388 U.S. at 153, 87 S.Ct. at 1991; *see also Pep v. Newsweek, Inc.,* 553 F.Supp. 1000, 1003 (S.D.N.Y.1983) (Failure to investigate or reliance on a questionable source "may tend to show that a publisher did not care whether an article was truthful or not, or perhaps that the publisher did not want to discover facts which would have contradicted his source.").

■ This court also concludes that the defendants' reliance upon the limited doctrine of "neutral reportage" is misconceived and is therefore rejected because the "reportage" in the case at bar was neither accurate nor disinterested as reflected by the record. The scope of the privilege is severely limited to ensure that the media is not granted "absolute immunity to espouse and concur in the most unwarranted attacks ... made by persons known to be of scant reliability." *Cianci v. New Times Publishing Co.,* 639 F.2d 54, 69–70 (2nd Cir.1980). Clearly, " 'a publisher who in fact espouses or concurs in the charges made by others or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage' but rather 'assumes responsibility for the underlying accusations.' " *Id.* at 68 (quoting *Edwards v. National Audubon Soc'y, Inc.,* 556 F.2d 113, 120 (2nd Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977)).

■ Finally, the *Journal* asserted that the constitutional privilege for expressions of opinion protected the statement that "Thompson said she believes that Connaughton, a candidate for municipal court judge, used 'dirty tricks' in obtaining her cooperation with his personal investigation of New." It argued that the conclusion that Connaughton was guilty of "dirty tricks" represented Thompson's personal opinions of Connaughton's actions. However, "[o]pinions based on false facts are actionable ... against a defendant who had knowledge of the falsity or probable falsity of the underlying facts." *Davis v. Ross,* 754 F.2d 80, 86 (2nd Cir.1985) (quoting *Hotchner v. Castillo–Puche,* 551 F.2d 910, 913 (2nd Cir.), *cert. denied sub nom. A.E. Hotchner v. Doubleday & Co.,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977)); *accord Cianci v. New Times Publishing Co.,* 639 F.2d 54, 65 (2nd Cir.1980); *see also Lewis v. Time Inc.,* 710 F.2d 549, 554 (9th Cir.1983). Thompson's claim that Connaughton resorted to "dirty tricks" to induce her statements was based upon the false factual assertions that Connaughton had offered Thompson jobs, trips and anonymity. Because the *Journal* had obvious reasons to doubt the truth of those underlying facts, the references to "dirty tricks" were not constitutionally protected statements of opinion.

For the reasons stated above, the judgment of the district court is hereby AFFIRMED.

APPENDIX A

# Municipal Court race will have more than one loser

OCT 3 0 1983

## Editor's notebook

By Jim Blount

There will be more than one loser in the heated Hamilton Municipal Court contest between Judge James H. Dolan and challenger Daniel E. Connaughton.

One person will emerge from the Nov. 8 election as the winner of a six-year term on the court which serves the City of Hamilton and two neighboring townships, Ross and St. Clair.

But in the campaign debris will be more than a dejected candidate and a handful of disappointed campaign workers.

The Dolan-Connaughton battle has been all it was expected to be and more — and there is still more than a week before voters will have to go to the polls to make a choice. A lot could happen in the next eight to nine days.

ACCORDING to our recent observations, most voters consider it a tough decision — and getting tougher.

Last week's array of charges and counter charges probably has taken some votes from Dolan. But it isn't certain if it has boosted Connaughton's prestige.

It is certain, as the verbal firing continues, that more and more people will register their disgust and confusion with both men by refusing to vote for either candidate.

As the heat increases, it also appears most voters want to be sure they will support the most honorable and cleanest candidate, not just the one with the most appealing face, the most familiar name, the most advertising or the most votes.

As one voter remarked, "I want to be sure that my vote won't be discredited by something that happens after the election is over."

Another said "I don't mind voting for people I know may lose an election, but I resent voting for a person who I later find has been deceitful or dishonest in campaigning."

Both comments came from persons who said they hadn't made a decision on the Hamilton Municipal Court candidates.

COMPLICATING the campaign are the bribery charges pending against Billy New, a former court employee.

Of course, it should be emphasized that New hasn't been tried, and that a person is presumed innocent until proven guilty. It also should be stressed that New hasn't been indicted. In fact, his case hasn't been weighed by a grand jury.

A Butler County grand jury is scheduled to begin hearing the New case Monday — which highlights some of the other potential losers in the Dolan-Connaughton scrap.

Whatever the outcome of the grand jury, more persons are likely to come under suspicion because of the intensity of the judicial campaign and the nearness of the election.

Those potential losers are Butler County prosecutor John Holcomb and the individual members of the grand jury.

Holcomb already has been attacked for (1) delaying the grand jury, (2) moving it up, (3) refusing to handle the New case in a special manner, or (4) all of the above, depending on the politics of the person rating his performance.

Although Holcomb understands that criticism and doubt come with the job, he also is aware that his handling of the case could become an issue in his own re-election campaign next year.

Consider these possibilities, all adverse to Holcomb:

• The grand jury indicts New. In the trial after the election, New is found guilty. If Connaughton loses the election, then later he could claim that Dolan's candidacy was aided by the timing, and that if the case had been expedited that the election outcome would have been different.

• The grand jury indicts New. In the trial after the election, New is acquitted. If Dolan loses, then later he could charge that Connaughton's victory had been because of the frivolous charges against New, which also damaged the judge's reputation. Dolan could argue that he would still be the judge if the matter had been resolved before Nov. 8.

ANOTHER potential loser is the media — especially the *Journal-News* and the *Cincinnati Enquirer.*

Stories on the Dolan-Connaughton fight in the *Enquirer* last week certainly helped to fuel the fire.

But in the process, the motives and credibility of the Cincinnati newspaper also are in question.

Some observers are asking how the *Enquirer* can justify the placement of a story critical of Dolan at the top of page one Thursday morning, Oct. 27, two days after U. S. forces participated in the invasion of Grenada, a day after the legality and necessity of the military action was questioned or condemned by some members of Congress and U. S. allies, and while the nation was still angered by the deaths of more than 225 U. S. Marines in a terrorist explosion last Sunday.

Judge Dolan suggested an answer when he charged Jim Delaney, an *Enquirer* editor, with threatening a page one smear Thursday morning if the judge didn't cooperate with the newspaper and its reporter (Karen Garloch), and if the judge didn't cancel a press conference, open to all media, scheduled for Thursday afternoon.

Also surfacing periodically through the campaign has been the unproven suggestion that the Connaughton forces have a wealthy, influential link to *Enquirer* decision-makers.

MEANWHILE, the dilemma facing the *Journal-News* is what to do about an endorsement in the Dolan-Connaughton race.

Should the newspaper play it safe and skip an endorsement for fear that post-election disclosures could embarrass or discredit the newspaper?

Or, should a *Journal-News* editorial simply remind voters, as was mentioned earlier, that everyone is innocent until proven guilty and that, in fact, there are no charges pending against the judge?

But taking a safe, self-serving course would be shirking a responsibility held sacred by this newspaper.

——

OF COURSE, the big loser — almost regardless of the outcome — is likely to be the court and the entire judicial system.

Connaughton, in seeking election, has raised some interesting questions about the conduct of the court.

And, in defending his six years on the bench, Dolan has countered with some points which, while to his favor, also expose some potential faults in the system.

——

TO SALVAGE something positive out of this campaign, perhaps there should be a resolve to take a close look at the local system of justice.

This would not be a sensational expose focusing on personalities and politics, but on the system itself.

Instead, it would be a calm probe searching for shortcomings and potential trouble spots in procedures, policies, existing laws, etc., which, regardless of the capabilities of the judges, interfere with justice.

The only question would be: "What changes are necessary if the judicial system is to work with efficiency and with fairness?"

Unfortunately, that can't be done before Tuesday, Nov. 8.

RALPH B. GUY, Jr., Circuit Judge, dissenting.

An independent review of the entire record in this case leads me to the inexorable conclusion that plaintiff failed to prove the existence of "actual malice," i.e., reckless disregard of the truth, by clear and convincing evidence. Therefore, I must respectfully dissent.

### I.

The majority opinion sets forth a lengthy recitation of the factual background of this case. There are, however, two glaring omissions which I believe are critical to the proper resolution of the actual malice issue.[1] First, the majority neglects to quote the exact language of the allegedly defamatory article. Second, the majority opinion does not adequately address the admissions made by the plaintiff during the course of an interview with the defendant, *Journal–News.* This interview was conducted *prior* to the publication of the article and the excerpts reveal that plaintiff essentially confirmed the substance of the factual allegations which subsequently appeared in the article.

When the article is read in light of the plaintiff's undisputed, pre-publication admissions to the *Journal–News,* it becomes abundantly clear that the plaintiff could not show that the *Journal–News* had printed the story in "reckless disregard of the truth" as is required by the actual malice standard. Moreover, I submit that the plaintiff could not have made the requisite showing of actual malice at trial under any standard of proof, let alone the rigorous "clear and convincing evidence" standard which applies in this case. Finally, I believe reversal is required even under the narrow scope of appellate review utilized by the majority.

### A. *The Article*

The majority opinion provides only a generalized description of the allegedly libelous article stating that "Thompson's

——

1. There is one further omission which is not directly relevant to the disposition of this appeal but, nevertheless, bears mentioning. In all fairness to Judge Dolan, it should be noted that he was cleared by a grand jury of any wrongdoing in connection with the indictment and conviction of his court administrator.

charges branded Connaughton as a liar, an extortionist, an unethical opportunist who was waging [a] 'deceitful' and 'dishonest' and generally 'dirty' campaign...." At 834. I believe that the proper analysis of the issues before us requires a more detailed account of the exact language which appeared in the article. The article which precipitated this case was printed beneath a headline which read, "Bribery Case Witness Claims Jobs, Trip Offered." [2] The following excerpts are quoted from the article:

A woman called to testify before the Butler County Grand Jury in the Billy Joe New bribery case claims Dan Connaughton, candidate for Hamilton Municipal Judge, offered her and her sister jobs and a trip to Florida "in appreciation" for their help.

Alice Thompson, 22, 1740 Shuler Ave., was scheduled to testify before the grand jury in relation to the charges against New, who resigned his court position Sept. 22.

Thompson said she believes Dan Connaughton, a candidate for municipal judge, used "dirty tricks" in obtaining her cooperation with his personal investigation of New.

Connaughton, in an interview with the *Journal-News* Monday, confirmed meeting with Thompson.

But he denied any wrongdoing and said Thompson misinterpreted comments and discussion while attending meetings with him and persons involved in his campaign who were gathering information about New and Dolan.

. . . .

Thompson said her reason for wanting to talk to the *Journal-News* were: 1. To let people know she did not "snitch" on New. 2. To reveal the "dirty tricks" Connaughton pulled to get her to make a statement.

She said two other things bothered her about Connaughton's actions: (1) he did not protect her anonymity as promised and (2) he allowed other people to hear tapes of a session with Connaughton and

other supporters about what happened with New during Thompson's recent appearance in Hamilton Municipal Court.

Connaughton and some of his supporters and two neighbors were contacted by the *Journal-News* Monday to obtain their recollections of the meetings and conversation.

They claim there was never a direct offer to Alice Thompson and her sister Patsy Faye Stephens, 1757 Shuler Ave., Hamilton.

Connaughton did admit there was talk about the two sisters working in an ice cream shop the Connaughtons might open.

. . . .

Thompson claims the tapes were turned off and on during a session she claims lasted until 5:30 a.m. When the tape was turned off, she said Connaughton made promises about a job and a post-election trip to Florida for Thompson and Stephens which the Connaughton family was going to take.

The Barnes claim the tapes ran continuously.

Dan Connaughton said there were times when the tapes were stopped.

Thompson said that either at that second meeting or a subsequent third meeting Connaughton offered:

. a job for Thompson in appreciation for her help with Connaughton's investigation of Billy New and Judge Dolan.

. a municipal court job for Stephens.

. an invitation for Thompson and her sister to go on a post-election trip to Florida with Connaughton and his family.

. to set up Thompson's parents, Zella and Brownie Breedlove, in the restaurant business at the location of Walt's Chambers, which Connaughton owns and leases.

. . . .

Connaughton and his supporters claim no promises were made.

Connaughton said he suggested the two sisters may want to go South.

**2.** A copy of the entire article appears in an appendix attached to this dissent.

Connaughton said his wife had thought about opening a gourmet ice cream shop at the Walt's Chambers location.

....

Thompson claimed that Connaughton promised a post-election dinner at the Maisonette in downtown Cincinnati.

Connaughton said "it may have been discussed. I wouldn't say it wasn't discussed."

Thompson claimed Connaughton had told her the tapes he made of her and her sister's statement Sept. 16 or Sept. 17 were to be presented to Dolan.

Thompson said Connaughton hoped to get New and Dolan to resign and then to have himself appointed as municipal judge.

Plaintiff claimed that the following allegations were false and defamatory: (1) that he had threatened to confront Judge Dolan with the taped allegations of the informants in order to force his resignation; (2) that he had promised the informants that they would remain anonymous; (3) that he had promised the jobs, a trip to Florida, and an expensive dinner "in appreciation" for their cooperation; and (4) that he had used "dirty tricks" to obtain their cooperation.

B. *The Connaughton Interview*

Prior to the publication of the foregoing article, the *Journal–News* arranged an interview with plaintiff in order to confirm Ms. Thompson's allegations. I find the transcript of the interview to be very revealing with respect to the issue of actual malice.

1. *Allegation that Plaintiff had Intended to Confront Judge Dolan With the Tape Recorded Accusations*

Q. Did you ever say—tell Alice that your purpose was to collect the evidence, present the information to Dolan, get New and Dolan to resign, and then for you to be appointed to that post?

A. That I would present what I had to them ...

Q. Yeah, you'd get what you ...

A. And then they would resign and I would be appointed?

Q. Yeah. Or that your intention was to try to—at least—at the very least confront them with the information—was that your intention at all? I mean, in interviewing these people, was to confront Dolan with this?

A. Well, I don't know that I had a firm purpose prior to hearing what they had to say, what I was going to do with the information once I got it. I think it would be fair to say, sometime during those three or four hours that they were there, that I probably made a remark along the lines that I just can't believe what I'm hearing, and, you know, I would think if they could hear what we're hearing, they would probably resign. I mean, I thought the allegation was that serious. But to tell her that—to answer that—and if she's saying that was my announced purpose of what I had them there for and what we were going to do with the information, my answer would be no.

MR. BLOUNT: You didn't tell her you were going to take the tapes to him? and play them for them?

A. No. No. What I might have said is, boy, I'd sure like to let them hear these tapes and see what they've got to say for themselves, you know, in a fashion such as that.

MR. BLOUNT: In an expression of shock.

MR. CONNAUGHTON: Yeah, Yeah, as I almost fell off of the fireplace. Right.

....

[MR. BLOUNT] But to get back to the question on the deal about New and Dolan's resignation—was it ever your intention, either during this interview or subsequent to it, to use the tapes as an attempt to get New and Dolan to resign?

A. I can only answer this way. After hearing it all, I knew it would be an unrealistic approach, you know, to go down to their office and say do you gentlemen have about an hour, I'd like for you to listen to something, and then say-

ing, oh, well, okay, if you want to accept our resignations, you know, we quit. And you know, that was absolutely impractical and would not apply. I do not deny that during the course of saying a lot of things in total shock and wondering what in the world we were ever going to do with something that was dynamite, I probably said something like yeah, I'd like to go down there and let them hear this and see what they've got to say about it, you know.

Q. As far as the resignation though?

A. Well, I probably would have put an add-on and said, you know, Goddamn, after they hear this they ought to just resign and quit, or something, you know, in that kind of a setting and expression.

### 2. *Alleged Promise of Anonymity for the Informants*

Q. Did you ever promise Alice Thompson anonymity?

A. That question was discussed, and I was hoping [sic] to her, and I told her it would be my intention and hope that she could remain anonymous, yes. But did I promise her anonymity, the answer would be no. Did we discuss it, we sure did, and I expressed to her my desire as well as her desire that she could remain anonymous.

Q. Do you think that she felt that that was a promise? Did she ever refer to it later, as, you know, well I, you know, I ...

A. I imagine she feels betrayed.

Q. And why would that be?

A. Because she's not anonymous, and she probably felt that my representation, that maybe she could remain anonymous had been a breach of trust to her.

### 3. *Alleged Job Offer*

Q. Did you ever talk to Alice about getting a job for her in appreciation for her help with your investigation of New and Dolan?

A. No.

Q. Not a waitress job?

A. No.

Q. Did you promise a Municipal Court job for her sister Patsy Stephens?

A. No.

Q. Did you offer to have "the sisters go on a post election trip to Florida with you and your family to stay in a condominium"?

A. No.

Q. Did you offer to set up Thompson's parents, the Breedloves, in what is now Walt's Chambers, which you own and lease?

A. Absolutely not.

Q. Why would she say this to us?

A. What was discussed in an offhanded way, the people who own that bar, who we're not very pleased with, their lease expires next September. My wife has the idea that she wants to open an ice cream type shop like Graeters, or some such thing as that, and I heard her discussing with them that maybe, since Patty had run this Homette Restaurant or something of that nature, that maybe she would help out and participate in the operation of this—whatever you want to call it—deli shop or gourmet ice cream shop. Yes, and I was present when that took place.

Q. And when was that?

A. Well, I don't think it was that night. As I recall, this was a later time that we had seen them.

Q. But that would only by for Patty (unclear)?

Q. I guess Alice was there, and the offer may have been extended to her in that fashion, that she could work there or something—I wouldn't be surprised if that was said.

### 4. *Alleged Promise of a Florida Trip*

Q. What about this post-election trip to Florida? Is there any possibility that they were, in an off-hand way, well, you know, you guys want to go, you know, you can go along, or something like that?

MR. BLOUNT: Did you talk about anything like that?

A. Ummm-hmmm. After getting over the initial shock it became a little clearer to me of—kind of how scary this

thing was with the information they gave to us, as far as, if their personal safety was at stake, and before this ripened into a police matter officially where they might get protection if that would be required, I do remember in an off-handed way it being discussed or some thing that they ought to ... they could go down to Hilton Head or Florida, or something like that, or maybe hide out or something like that, I don't know. But I own no property and have nothing to offer them. . . .

5. *Alleged Promise of Expensive Dinner*

Q. One last statement. At lunch Thompson said that you promised to take her and her sister out to a post election victory dinner at the Maisonette.

A. I promised to take them to the Maisonette? Hell, I haven't been to the Maisonette for years.

MR. BLOUNT: Was it discussed? Was it brought up?

A. It may have been. It may have been. I won't deny that some loose discussion in a kidding way was ...

MR. BLOUNT: Did you compare Bob Evans with the Maisonette?

A. No, we didn't make those comparisons, but if she said that was discussed, I wouldn't say that she was not telling the truth. If she says that I made a firm statement that we were going to definitely plan a party at the Maisonette, that's not true.

## II.

Plaintiff's responses set forth above confirmed the fact that the subject of jobs, vacations, and dinners, had been discussed with the informants. Likewise, plaintiff admitted that he had expressed his "hope" and his "intention" to protect Ms. Thompson's anonymity. Plaintiff also admitted that he had discussed the possibility of playing the taped September 17 interview for Judge Dolan. Thus, I believe that the pre-publication interview of the plaintiff conducted by the *Journal–News,* confirmed the factual basis of Ms. Thompson's allegations.

It would be difficult if not impossible for the *Journal–News* to conclusively determine whether Ms. Thompson was justified in construing the plaintiff's statements as "promises." This is more a question of interpretation than one of fact. I believe that the allegations made by Ms. Thompson (and reported virtually verbatim by the *Journal–News* ) "amounted to the adoption of one of a number of possible rational interpretations of a document [in this case a discussion] that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of 'malice' under *New York Times."* *Time, Inc. v. Pape,* 401 U.S. 279, 290, 91 S.Ct. 633, 639, 28 L.Ed.2d 45 (1971).

It should also be noted that the *Journal–News* reported plaintiff's contention that Ms. Thompson had misinterpreted his statements. Moreover, plaintiff's position was set forth in the fifth sentence of the article, thereby alerting readers to the conflicting viewpoints. The article also revealed that plaintiff's supporters who had attended the September 17 meeting stated that plaintiff had not made any "direct offers" to the informants. Basically, the article presented two versions of a discussion which admittedly took place and allowed the readers to draw their own conclusions as to which version was more accurate.

The majority opinion discounts the statements made by the plaintiff during the course of his pre-publication interview with the *Journal–News.* At one point the majority states, "Connaughton's answers to these questions are a matter of record and, when read in context, do not support the *Journal–News'* conclusions that he admitted to any of the Thompson charges which he had unequivocally denied during the early stages of the interview." At 836. It is precisely because Connaughton's statements "are a matter of record" that this court is obliged to consider them in determining whether the judgment against the *Journal–News* is contrary to the first amendment. *See, e.g., New York Times v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964) (an appellate

court "must make an independent examination of the *whole* record, so as to [insure] that the judgment does not constitute a forbidden intrusion on the field of free expression.") (emphasis added) (citation omitted).

Elsewhere in its opinion, the majority states:

Moreover, the jury obviously refused to credit the *Journal's* construction of Connaughton's interview of October 31. It accepted Connaughton's express denials of each Thompson charge and considered the significant language interpreted by the *Journal* to constitute his admissions of those charges, when read in context, as nothing more than conjecture elicited by structured questions calculated to evoke speculation. Thus, upon reviewing the record in its entirety, this court concludes that the jury's determinations of the operational facts bearing upon the falsity of the article in issue were not clearly erroneous.

At 841.[3]

I cannot join in the cavalier manner in which the majority dismisses these undisputed factual statements made by the plaintiff. Admittedly, plaintiff initially denied the general allegations made by Ms. Thompson; however, he then promptly contradicted himself by admitting that each of these matters had been discussed. I have quoted extensively from the transcript of plaintiff's interview in order to show that his statements were not taken out of context, nor can they be construed as mere "speculation." Rather, they provided ample basis for the *Journal–News* to conclude that Ms. Thompson's allegations were substantially true. Plaintiff did not deny the fact that such discussions had taken place; he merely suggested that Ms. Thompson had "misinterpreted" his comments. This is the way in which it was reported in the November article. Given these undisputed facts, I cannot agree with the majority's conclusion that the *Journal–News* printed Ms. Thompson's allegations with a "high degree of awareness of ... probable falsity." *See St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed. 2d 262 (1968) (citations omitted).

### III.

A substantial portion of the majority opinion is devoted to the analysis of the proper standard of appellate review of a finding of "actual malice." Specifically, the majority has attempted to resolve the conflict which it perceives is created by the Supreme Court's opinion in *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), wherein the Court squarely held:

We hold that the clearly-erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by *New York Times Co. v. Sullivan.* Appellate judges in such a case must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.

Id. at 514, 104 S.Ct. at 1967. The majority found that a broad reading of the Court's holding in *Bose* would conflict with the mandate of Fed.R.Civ.P. 52(a) which dictates that "findings of fact shall not be set aside unless clearly erroneous...." The majority also expressed the opinion that if an appellate court engaged in *de novo* review of factual findings, it would "impinge" on a plaintiff's constitutional right to a jury trial as guaranteed by the seventh amendment. Therefore, the majority has attempted to reconcile this conflict by stating:

Logic and reason dictate that the *Bose* directed *de novo* review did not apply to preliminary, operative, or subsidiary fac-

---

**3.** Because I believe that plaintiff has utterly failed to prove actual malice by clear and convincing evidence, I find it unnecessary to analyze whether he proved the requisite elements of falsity and defamation by a preponderance of the evidence. I find it ironic, however, that in order to find the allegations contained in the article were false, the jury would not only have to discredit Ms. Thompson's testimony, but also discredit some of the statements made by the plaintiff himself when he admitted that the subjects had been discussed.

tual determinations anchored in credibility determinations but rather was limited to a review of the ultimate conclusion of clear and convincing proof of actual malice.

At 842.

Admittedly, the majority opinion in *Bose* is somewhat confusing; nevertheless, I do not believe that a fair reading of that opinion can support the extremely narrow construction which it is given by the majority.[4] Therefore, since *Bose* cannot be distinguished on its facts, I believe this court is bound by the Supreme Court's pronouncements in that case regardless of whether we agree or disagree with the Supreme Court's method of analysis.

Moreover, I do not believe that this case requires us to determine whether or not the *de novo* review standard announced in *Bose* extends to determinations of credibility made by a jury. It is *undisputed* that the plaintiff made the statements from which quoted in Part I of my dissent. Given these statements, I would find, as a matter of law, that plaintiff failed to prove actual malice by clear and convincing evidence. Therefore, I would refrain from attempting to resolve the admittedly difficult issues posed by the *Bose* opinion since it is not necessary to the resolution of the instant case. The Sixth Circuit has not yet had occasion to rule on these issues and I would prefer to wait for a case in which they are squarely presented.

Even if I were to agree that this court should adopt the circumscribed reading of *Bose* proposed by the majority in the instant case, I still could not concur in its judgment. The majority sets forth eleven "subsidiary or operative facts" which the jury could have found from the evidence presented at trial. At 843. The majority infers these conclusions from the jury's

finding of "actual malice" in the general verdict. Under the majority's interpretation of the proper standard of appellate review, we are bound to accept these inferred conclusions as true unless they are "clearly erroneous."

These eleven conclusions can be summarized in five general categories: (1) the *Journal–News* had a motive to publish sensational falsehoods about the plaintiff because it supported his opponent in the upcoming election and because it hoped that such stories would boost its circulation; (2) Ms. Thompson was an unreliable source given her emotional instability; (3) Other witnesses present at the meetings between Thompson and Connaughton discredited her accusations; (4) The *Journal–News* "intentionally" avoided interviewing a key witness; and (5) the *Journal–News* printed Ms. Thompson's allegations with the knowledge that plaintiff would be harmed "personally, professionally, and politically." The majority found that these possible conclusions were not clearly erroneous and therefore must be taken as true. Purporting to apply a *de novo* review of the "ultimate fact," i.e., actual malice, the majority concluded that given the existence of these "subsidiary facts" the plaintiff had demonstrated by clear and convincing evidence that the *Journal–News* had published Ms. Thompson's allegations despite serious doubt as to their truth. At 844.

Even if these speculative "subsidiary" factual findings were the only evidence before this court, I would be hesitant to agree that they constitute "clear and convincing evidence" of a reckless disregard of the truth.

First, with respect to the "finding" that the editorial staff sought to defeat plaintiff's campaign by discrediting him, this alone does not support a finding of actual malice. *See, e.g., Old Dominion Branch*

---

4. The Supreme Court's decision in *Bose* has generated a great deal of controversy in academic circles and has spawned several law review articles, most of which are critical of the Court's reasoning. *See, e.g.,* Bezanson, *Fault, Falsity and Reputation in Public Defamation Law: An Essay on Bose Corp. v. Consumers Union,* 8 Hamline L.Rev. (1985); Monaghan, *Constitutional Fact Review,* 85 Colum.L.Rev. 229 (1985);

Note, *The Failure of Libel Law and Independent Appellate Review: Making Sense of Bose Corp. v. Consumers Union of United States, Inc.,* 71 Cornell L.Rev. 477 (1986); Comment, *The Expanding Scope of Appellate Review in Libel Cases—The Supreme Court Abandons the Clearly Erroneous Standard of Review for Findings of Actual Malice,* 36 Mercer L.Rev. 711 (1985).

*No. 496 v. Austin*, 418 U.S. 264, 281–82, 94 S.Ct. 2770, 2779–80, 41 L.Ed.2d 745 ("[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard.") (citations omitted). Admittedly, the existence of a subjective dislike may be relevant to the issue of motive; however, the plaintiff must show more than an "intent to inflict harm"; he must show an "intent to inflict harm through falsehood." *Henry v. Collins*, 380 U.S. 356, 357, 85 S.Ct. 992, 993, 13 L.Ed.2d 892 (1965). The phrase "actual malice" is a legal term of art which is defined as the publication of a statement "with knowledge of its falsity or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726. It seems to me that the majority may have equated the term "actual malice" with "animosity" or "antipathy" rather than its technical legal definition. Nor is the "fact" that the *Jounral–News* sought to increase its circulation conclusive evidence of "actual malice." Once again, this only relates to motive and is not particularly probative, since I presume that all newspapers seek to increase their market share by publishing newsworthy stories.

Second, despite Ms. Thompson's history of personal problems, her allegations were not inherently unbelieveable and were entirely plausible in light of the preceding events which were known to the editors and reporters of the *Journal–News*. Nor is the fact that her allegations were "contradicted" by several other witnesses necessarily determinative. These witnesses were avowed supporters of the plaintiff and the fact that none of them claimed to have heard plaintiff make any offers does not disprove Thompson's allegations since she claimed that at least some of the "promises" were made privately off the record.

Third, the majority relies heavily on the "subsidiary" fact that the *Journal–News* "intentionally" failed to interview a key witness, Patsy Stephens, Ms. Thompson's co-informant who could have confirmed or discredited Thompson's allegations. It is well established, however, that the failure to investigate does not in itself establish actual malice. *St. Amant*, 390 U.S. at 733, 88 S.Ct. at 1326. In *Schultz v. Newsweek*, 668 F.2d 911 (6th Cir.1982), this court stated that "unless there is a showing of actual doubt concerning the truth of the statements, mere evidence of incomplete investigation is insufficient to show actual malice." 668 F.2d at 918. Furthermore, as noted by the majority, the *Journal–News* assigned "eight or nine" reporters to investigate Thompson's allegations. Even if the reporters were unable to substantiate her story, this is hardly indicative of a complete departure from the fundamental standards of investigative reporting.

Finally, and most importantly, the majority neglects to mention the one undisputed "subsidiary fact" which has the most relevance to the "ultimate fact" of actual malice, i.e., plaintiff's own statements. The fundamental issue in this case is whether the *Journal–News* knew or should have known that Ms. Thompson was lying when she said that the plaintiff had offered her a job, a trip, and an expensive dinner "in appreciation" for her cooperation and that he had promised to protect her anonymity and that he had threatened to confront Judge Dolan with Thompson's accusations. The factual basis of each one of these allegations was at least partially substantiated by the plaintiff himself. The record shows that the *Journal–News* did not decide to publish Ms. Thompson's allegations until after plaintiff had confirmed that the discussions had taken place. I emphasize that plaintiff has never denied making these statements which appear in the transcript of his pre-publication interview. Even if the eleven subsidiary factual conclusions inferred by the majority are given the most damaging interpretation, they still cannot support a finding of reckless disregard of the truth in light of the plaintiff's own uncontroverted admissions.

## IV.

As a final note, I find it necessary to briefly address plaintiff's contention that he was defamed by the portion of the article which contained Thompson's allegation that plaintiff had used "dirty tricks" to

obtain her cooperation as an informant. I discuss this issue separately because I find that the references to "dirty tricks" are constitutionally protected expressions of opinion.

It is well established that "there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries, but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (footnote omitted). It is a question of law as to whether an allegedly defamatory statement constitutes an expression of opinion or a statement of fact. *Ollman v. Evans*, 750 F.2d 970, 978 (D.C. Cir.1984) (*en banc*), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

The phrase "dirty tricks" appears twice in the article:

Thompson said she believes Dan Connaughton, a candidate for municipal judge, used "dirty tricks" in obtaining her cooperation with his personal investigation of New.

. . . .

Thompson said her reasons for wanting to talk to the Journal–News were:

. 1. To let people know that she did not snitch on New.

. 2. To reveal the "dirty tricks" Connaughton pulled to get her to make a statement.

She said two other things bothered her about Connaughton's actions: (1) he did not protect her anonymity as promised and (2) he allowed other people to hear tapes of a session with Connaughton and other supporters about what happened with New during Thompson's recent appearance in Hamilton Municipal Court.

I believe that the phrase "dirty tricks" is a conclusory phrase which does not lend itself to precise definition. The accuracy of this statement cannot be verified by any objective criteria. The language of the article which states "Thompson said she believes" clearly indicates that it was Thompson's personal subjective opinion that she had been the victim of "dirty tricks." Moreover, the article also set forth Thompson's allegations which provided the basis for her belief, i.e., that plaintiff had promised her anonymity and that he had broken that promise. The article also presented the plaintiff's position that Ms. Thompson had misinterpreted his comments. Thus, the readers were able to decide for themselves as to whether or not the plaintiff's actions constituted "dirty tricks."

In sum, I find that Ms. Thompson's characterization of the plaintiff's actions as "dirty tricks" is an expression of opinion which is protected speech under the first amendment. Therefore, the *Journal–News* should not be held liable for the publication of that opinion.[5]

For the foregoing reasons, I dissent.

5. The majority cites several Second Circuit cases and a Ninth Circuit case for the general proposition that "opinions based on false fact are actionable ... against a defendant who had knowledge of the falsity or probable falsity of the underlying facts." Maj. op. at 847 (citations omitted). Based on my conclusions in Part I of my dissent, I believe that the inverse of this rule is applicable in the instant case; i.e., if the underlying facts are substantially correct, then the newspaper cannot constitutionally be held liable for expressing an opinion with regard to those facts. *See Orr v. Argus–Press Co.*, 586 F.2d 1108, 1115 (6th Cir.1978).

## APPENDIX B

Tuesday, November 1, 1983 • Vol 59 • No 3••

# The Journal News

# Bribery case witness claims jobs, trip offered

By PAM LONG
Journal-News Writer

© Journal-News 1983

A woman called to testify before the Butler County Grand Jury in the Billy Joe New bribery case claims Dan Connaughton, candidate for Hamilton Municipal Judge, offered her and her sister jobs and a trip to Florida "in appreciation" for their help.

Alice Thompson, 22, 1740 Shuler Ave., was scheduled to testify before the grand jury in relation to the charges against New, who resigned his court position Sept. 22.

Thompson said she believes Dan Connaughton, a candidate for municipal judge, used "dirty tricks" in obtaining her cooperation with his personal investigation of New.

Connaughton, in an interview with the Journal-News Monday, confirmed meeting with Thompson.

But he denied any wrongdoing and said Thompson misinterpreted comments and discussions while attending meetings with him and persons involved in his campaign who were gathering information about New and Dolan.

Connaughton filed a complaint with Hamilton police Sept. 27, about New, former director of court services for Hamilton Municipal Court Judge Dolan.

Dolan — who is seeking re-election Nov. 8 — fired New Sept. 22.

New, 32, 160 Foster Ave., Hamilton

was arrested Oct. 3 on three counts of bribery. He was bound over to the grand jury by Acting Judge Jack Rosmarin Oct. 14.

New had worked about six years for Dolan, who removed himself from hearing the case in municipal court.

Thompson's statements were made last week in a tape-recorded interview with Journal-News representatives. Through a third party, she had contacted the Journal-News to ask for a chance to tell her side of the story.

She was interviewed by the newspaper with the understanding that she not discuss her contact with New in Hamilton Municipal Court because that would be covered in her testimony this week before the grand jury.

Thompson said her reason for wanting to talk to the Journal-News were:

• 1. To let people know she did not "snitch" on New.

• 2. To reveal the "dirty tricks" Connaughton pulled to get her to make a statement.

She said two other things bothered her about Connaughton's actions: (1) he did not protect her anonymity as promised and (2) he allowed other people to hear tapes of a session with Connaughton and other supporters about what happened with New during Thompson's recent appearance in Hamilton Municipal Court.

Connaughton, some of his sup-

porters and two neighbors were contacted by the *Journal-News* Monday to obtain their recollections of the meetings and conversations.

They claimed there was never any direct offer to Alice Thompson and her sister Patsy Faye Stephens, 32 1757 Shuler Ave., Hamilton.

Connaughton did admit there was talk about the two sisters working in an ice cream shop the Connaughtons might open.

Thompson and Stephens were subpoenaed among 25 people to appear before the grand jury this week.

In her interview with the *Journal-News* Thompson said there were three meetings and two phone calls initiated by Connaughton, his wife or his brother-in-law Dave Berry.

Thompson, who is represented by lawyer Matt Crehan, a Dolan supporter, is uncertain of the dates the two meetings were held.

She claims that sometime in late August or early September she walked in on a meeting in progress at the home of her parents, Zella and Brownie Breedlove, 1757 Shuler Ave.

Present at the meeting were Zella Breedlove, mother of Patsy Stephens and Alice Thompson; Stephens; Berry; Martha Connaughton (Dan Connaughton's wife); and Joe Cox, head of the Connaughton's campaign, she said.

Berry said he and Martha Connaughton wanted to talk with Stephens and went to the Breedlove house unannounced.

Thompson claims her sister was discussing Patsy's connection with New. Thompson said Martha Connaughton and Berry "knew all about me."

Thompson said she has been in Hamilton Municipal Court twice. In 1980 Dolan found her guilty of assault and ordered her to serve jail time.

In February 1982, Dolan found her guilty of petty theft from K mart on Dixie Highway. Thompson said she was fined, but not given any jail sentence.

Thompson said she became involved because her sister, Stephens, had contacted June Taylor in September 1982, giving Taylor information on DUI cases in Hamilton Municipal Court.

Taylor passed the name along to Martha Connaughton, Berry said.

Berry and Connaughton's wife claim that first meeting was Sept. 15 and Cox was not there.

Connaughton places the date at Sept. 2, noting his wife told him about the meeting with Stephens and Thompson.

Connaughton said in a letter to the editor published Sept. 20 in the *Journal-News:* "Sept. 17, 1982, I met with this individual. Prior to Sept. 17, 1982, I did not know this person, nor had I known any of the information I was then told."

The second meeting took place either Sept. 16 or Sept. 17 at 12:30

a.m. at Connaughton's home at 138 E. Fairway Drive in Hamilton, according to Connaughton and his supporters.

Thompson, Connaughton and others agree on who attended the meeting.

Those present at the late-night meeting were Thompson, Stephens, Dan Connaughton, Martha Connaughton, Berry, Cox, Ernie and Jeanette Barnes.

Connaughton explained this second meeting was held at 12:30 a.m. "to protect their (the two sisters') anonymity," and because both women were employed at Rinks and worked late.

The *Journal-News* learned that Stephens had been employed at a Rinks warehouse.

Thompson said she has been unemployed for eight months and last worked as a waitress.

The sisters were picked up at Breedlove's home by Berry and Cox, who took them to Connaughton's home.

The Barnes reside across the street from the Connaughtons. The Barnes said they had been asked by Berry and Martha Connaughton to be witnesses "to something very important," Berry had told Jeanette Barnes.

Jeanette Barnes, who was not active in the Connaughton campaign at the time of the second meeting, now is active in the campaign.

During the session, Connaughton supporters said two tape recorders ran. Thompson said there were three tape recorders.

Thompson claims the tapes were turned off and on during a session she claims lasted until 5:30 a.m. When the tape was turned off, she said Connaughton made promises about a job and a post-election trip to Florida for Thompson and Stephens which the Connaughton family was going to take.

The Barnes claim the tapes ran continuously.

Dan Connaughton said there were times when the tapes were stopped.

Thompson said that either at that second meeting or a subsequent third meeting Connaughton offered:

• a job for Thompson in appreciation for her help with Connaughton's investigation of Billy New and Judge Dolan.

• a municipal court job for Stephens.

• an invitation for Thompson and her sister to go on a post-election trip to Florida with Connaughton and his family.

• to set up Thompson's parents, Zella and Brownie Breedlove, in the restaurant business at the location of Wall's Chambers, which Connaughton owns and leases. The property is on Court Street opposite the Butler County Courthouse and next to Connaughton's law office.

Connaughton and his supporters claim no promises were made.

Connaughton said he suggested the two sisters may want to go South.

Connaughton said his wife had thought about opening a gourmet ice cream shop at the Wall's Chambers location.

Martha Connaughton said "a job was never promised."

She said the shop was "a dream" she's had for a year, but there are no plans to open a shop. She admitted "after this is all over with I would give them jobs. They deserve a break. That's the social worker in me coming out."

In her interview with the *Journal-News*, Thompson said she would have accepted the trip and the job.

Thompson said she was notified of a third meeting Sept. 21 when Berry called and said he needed to pick up Thompson and her sister.

The morning of Sept. 22 the two sisters were taken to Linda Berry Interiors, 1128 Hamilton-Cleves Road, where Stephens underwent a polygraph test, according to the Connaughton and Thompson.

Linda Berry is Dave Berry's wife.

Connaughton said the test was administered by Carl E. Anderson, a polygraphist from Cincinnati.

Thompson said she was encouraged by Cox, Berry, and Martha Connaughton to take the test. She refused.

Berry claims Thompson was not asked to take the polygraph test.

Connaughton said he waited to file charges until Sept. 27, because he wanted to get the results of the test back. Connaughton had not stayed for the entire polygraph exam.

Berry said Anderson had verbally told Berry that same day that Stephens passed the test.

Connaughton said his wife, Cox, Berry and the two sisters came to his office to pick him up for lunch.

Connaughton learned of New's resignation at his office through Jim Cooney, a lawyer.

Then some of the group went to the Bob Evans Restaurant on Colerain Avenue (U.S. 27), near Northgate, for lunch.

Connaughton said they went to that location in Hamilton County "to try to protect their [Thompson and Stephens] anonymity."

Thompson claimed that Connaughton promised a post-election dinner at the Maisonette in downtown Cincinnati.

Connaughton said "it may have been discussed. I wouldn't say it wasn't discussed."

Thompson claimed Connaughton had told her the tapes he made of her and her sister's statement Sept. 16 or Sept. 17 were to be presented to Dolan.

Thompson said Connaughton hoped to get New and Dolan to resign and then to have himself appointed as municipal judge.

Thompson said that when Dolan did not resign when New was fired, Connaughton became upset and said he was going to file charges. Thompson said she was angry about the prospect of charges being filed and she said she asked for immunity.

Connaughton claims he never told Thompson he was going to file charges.

Connaughton said Butler County Prosecutor John Holcomb assured him immunity would be given. Connaughton said he told Thompson she would have immunity.

After the complaint was filed, Thompson said Hamilton police detectives called her in for an investigation. She claims she told the police about the offers Connaughton had made, but officers weren't interested in discussing it.

Connaughton called her later that day Sept. 28 or Sept. 29 after she talked to police detectives. She said Connaughton had heard about the investigation and wanted to know what had happened at the police department.

"Me and him got into it. I told him I was against him and I hung up," Thompson said.

Thompson said Connaughton called her Oct. 2, the day New was arrested by Hamilton police on three counts of bribery. Thompson was one of three people listed in the charges.

Connaughton claims he did not call her the day she talked to police detectives. He claims she called him and was hysterical.

(EDITOR'S NOTE: Other *Journal-News* reporters and editors participating in the interviews and research were Laurel Campbell, Tom Grant, Jeanne Houck, Sue Kiesewetter, Jim Blount, Mike Jones, Bill Siebert, Larry Fullerton and Bob Walker.)