EXTRUSION PAINTING, INC., d/b/a
International Extrusions,
Plaintiff–Appellee,

v.

AWNINGS UNLIMITED, INC., d/b/a
Awnings by Sunair, Defendant–
Appellant.

No. 00–1682.

United States Court of Appeals,
Sixth Circuit.

June 27, 2002.

Before BOGGS and MOORE, Circuit Judges; and RUSSELL, District Judge.*

PER CURIAM.

Awnings Unlimited, doing business as "Sunair," appeals the district court's bench trial judgment determining that it had failed to pay amounts due under its contract with Extrusion Painting, doing business as International Extrusions or "Intex," and awarding Intex damages in the amount of $179,562.71. In 1997, Sunair issued a purchase order to Intex for aluminum support rods or "profiles." Sunair argues that the district court erred in finding that the contract called for pieces, as opposed to feet, of rods in the quantity ordered. Sunair also contends that the products delivered pursuant to the purchase order did not conform to the specifications of the contract. For the following reasons, we affirm the district court's judgment for Intex.

I

Sunair manufactures retractable canvas awnings. Homeowners use the awnings to cover a patio, businesses to a cover a sidewalk or storefront. To support the canvas, Sunair uses aluminum arms, technically referred to as "profiles." Sunair needs two types of profiles: a 20–foot profile for the upper arm of the awning and an 18–foot profile for the lower arm.

Sunair has always outsourced the production of the profiles to aluminum products companies, known as "aluminum extruders." Sunair retains the tool necessary for the precise manufacture of their awnings and loans the tool to the extruders who manufacture Sunair profiles. The extruders then push molten aluminum, of a certain type, through the tool and produce the profiles.

Prior to 1997, Sunair had purchased all of its upper and lower arm profiles from VAW, Inc. During that time, Intex repeatedly had attempted to convince Sunair to switch extruders. Also during that time, Sunair had licensed Astrup Corporation as a manufacturer and distributor of Sunair's awnings. Unlike Sunair, Astrup had used Intex as its extruder for several years. After testing Intex's profiles, Sunair told Intex representatives that it would not switch extruders because the tensile and lateral strength of Intex profiles did not meet Sunair's requirements. Astrup, however, continued to use Intex profiles to manufacture Sunair awnings under the license agreement.

In early 1997, VAW lacked the capacity to produce enough profiles to satisfy Sunair's needs. Sunair sent a purchase order to Intex on July 23, 1997. The purchase order contained the following entries:

| ORDERED | UNIT | ITEM NO. | DESCRIPTION | UNIT COST |
|---|---|---|---|---|
| 1,400 | EACH | /MISC. | Upper Arm Profile 20' WHT | |
| 600 | EACH | /MISC. | Upper Arm Profile 20' BRW | |
| 600 | EACH | /MISC. | Upper Arm Profile 20' SIL | |
| 1,260 | EACH | /MISC. | Lower Arm Profile 18' WHT | |
| 540 | EACH | /MISC. | Lower Arm Profile 18' BRW | |
| 540 | EACH | /MISC. | Lower Arm Profile 18' SIL | |

* The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

JA at 1139.

Intex interpreted the order to call for 2,600 entire 20′ profiles and 2,340 entire 18′ profiles. The purchase order required that the profiles be produced within three weeks. JA at 1139. Intex checked with its production personnel to ensure that it could fill the order in the time required, produced an initial batch of profiles, and shipped the profiles to Sunair. JA at 1187.

As indicated above, the purchase order did not indicate any agreed-upon price for the profiles. Intex calculated the price for the profiles from the price list that it had circulated to Sunair seven days before the purchase order was issued. The price list denominated the price per foot for each of the different types of profiles. JA at 1137. The total purchase price for the 4,940 profiles that Intex produced was $179,562.71.

Upon receipt of Intex's shipment, Sunair realized that there was a problem. Sunair refused to remit the purchase price, claiming that it had meant to order 4,940 *feet* of profiles, not 4,940 profiles. After efforts to convince Intex that it should accept the return of the "excess" profiles, Sunair claimed that the upper arm profiles did not meet its tensile strength requirements. Sunair announced its intention to reject all of the profiles as failing to conform to the requirements of the contract.

Shortly thereafter, Intex filed this action in the United States District Court for the Eastern District of Michigan for breach of contract due to Sunair's failure to remit the purchase price. Intex moved for summary judgment. District Judge Paul Gadola denied the motion, holding that the purchase order was ambiguous and that there was at least a genuine issue of material fact as to whether Intex understood that the order was for *feet* as opposed to *pieces* of profile and whether the profiles failed to meet the contractually required strength standards.

The parties agreed to a bench trial, and the trial was reassigned to District Judge Patrick Duggan. Pursuant to the bench trial, the district court determined that Intex had no reason to understand that "each" meant "feet" in the purchase order and that Intex had never promised a stronger aluminum alloy for the profiles. Thus, the district court held that Intex had completely performed under the contract and that Sunair had breached the contract by failing to pay the purchase price. The district court ordered damages in the amount of $179,562.71.

Sunair now appeals the district court's bench trial verdict.

## II

This appeal requires us to review a district court's verdict pursuant to a bench trial. Litigants seeking to overturn a district court's bench trial verdict bear a heavy burden. Although this court reviews *de novo* the district court's conclusions of law, we review its findings of fact only for clear error. Fed.R.Civ.P. 52(a); *Connaughton v. Harte Hanks Comm., Inc.*, 842 F.2d 825, 828 (6th Cir.1988).

Sunair argues that the district court erred in two respects. First, Sunair claims that the district court did not adequately consider the course of dealing between Sunair and Intex, as required by Michigan law, in determining that the agreement called for 4,940 pieces, rather than feet, of profiles. Second, Sunair contends that the district court erred in determining that the profiles delivered conformed to the specifications required by the agreement. We consider these questions separately below.

## A. The Quantity of the Profiles Ordered

In its bench trial verdict, the district court found that the purchase order

requested 4,940 profiles, rather than 4,940 feet of profiles. The district court further found, as a matter of fact, that "Intex did not know, nor was there any reason to know, that Sunair did not intend to order the quantity as reflected on the purchase order."

Sunair contends that the district court erred in this finding. First, Sunair appears to contend that "each" simply means "feet" in the context of Intex's price list. Intex did issue a price list to Sunair, seven days before Sunair issued the purchase order, that quoted the price of the profiles by the foot. Sunair contends that, with the term "each," the purchase order refers to the unit denominated in the price list, namely a "foot."

Sunair's facial interpretation of the purchase order is strained. Looking simply at an entry on the purchase order, the product described is, for example, an "Upper Arm Profile 20′ SIL." More immediately, "each" appears on the face of the purchase order to refer to the product described, a profile. Indeed, statements of Olaf Martenson, Sunair's president, made more proximate to the order, concede that even he thought the order as written called for pieces of profiles. Referring to the "each" phrasing in a letter to Intex less than a month after the purchase order, Martenson wrote: "Obviously, it was a small typing error on our part. This error should have been questioned by your company right away." JA at 1153–54.

Sunair moves to slightly stronger ground when it argues that parol evidence requires that this court interpret the order to request feet of profiles. Sunair contends that the course of dealing between its licensing partner, Astrup, and Intex indicates that the order should have been understood to refer to "feet" of profiles. The Uniform Commercial Code, adopted in relevant part by Michigan law, provides that a written agreement "may be explained or supplemented" by the "course of dealing" and "usage of trade." U.C.C. § 2–202; Mich. Comp. Laws Ann. § 440.2202 (West 1994 & Supp.2001). Generally speaking, the "course of dealing" may be at least considered, however express the terms of the written agreement. The "express terms of an agreement" and the "course of dealing" are to be construed "consistently with each other ... wherever" such a construction is "reasonable." U.C.C. § 1–205; Mich. Comp. Laws Ann. § 440.1205. Where a reconciling construction of the text is not reasonable, however, the "express terms of an agreement" control. *Ibid.*

■ Sunair asks this court to consider the course of dealing between *Astrup* and Intex in interpreting the agreement between the parties *Sunair* and Intex. Astrup was licensed to manufacture awnings under the Sunair name, but was a separate corporation that ran its own manufacturing operation. Indeed, on several occasions Sunair endeavored to dissuade Astrup from using Intex profiles, but lacked sufficient control to make Astrup switch. In order to be a relevant "course of dealing," the evidence must concern a sequence of conduct between the exact parties to the transaction in question. *See* U.C.C. § 1–205(1); Mich. Comp. Laws Ann. § 440.1205(1). *See also* U.C.C. § 1–205(1) cmt. 2 ("Course of dealing under subsection (1) is restricted, literally, to a sequence of conduct *between the parties* prior to the agreement."). Although Astrup and Sunair did have a contractual relationship, it would be a stretch to consider them the same entity for purposes of incorporating Astrup's course of dealing into the agreement in this case. Intex could reasonably assume that Sunair would do things differently than Astrup.

Intex's interactions with Astrup, however, do provide some evidence of the "usage of trade" in the relationship between extruders and awning manufacturers. Sunair argues that the interactions between Astrup and Intex provide evidence unambiguously suggesting that Sunair's order should be construed as requesting 4,940 feet of profiles. We disagree. It is true that Astrup consistently ordered its profiles in units of feet, and correspondingly Intex always quoted prices to Astrup by the foot. *See, e.g.,* JA at 1313–23 (containing several Astrup purchase orders). However, Astrup purchase orders always requested explicitly quantities by the foot. *See, e.g.,* JA at 1313 (where Astrup orders "3600.000 FT" of a particular type of profile). To us, the usage of trade appears to be that the purchaser must specify the units. When Sunair did not refer to "feet," but instead referred to "each," it was reasonable for Intex to assume that Sunair meant something different than feet given the industry practice of *explicitly* ordering in feet.

Sunair omits from its account of the course of dealing that *Sunair* has ordered products from Intex before. In those purchase orders, Sunair has occasionally ordered products by the foot. *See* JA at 1189 (a May 23, 1995 purchase order with the following entry: "2408 FT ... Solair Hood—24'1" Length—Fuller White"). However, Sunair has also ordered extruded aluminum products with the abbreviation "EA" for "each." *See* JA at 1191 (April 25, 1995 purchase order with the following entry: "24 EA ... 20' Length White"). In these prior purchase orders, Sunair clearly meant pieces of extrusion. The real "course of dealing" between Intex and Sunair indicates that Intex was fully justified in thinking that "each" meant pieces just as the term had meant in prior Sunair orders.

Sunair next argues that Intex had actual knowledge that the quantity specification in the purchase order was an error. According to Sunair, officials at Intex knew that Sunair only wanted a "trial order" of profiles. Because the quantity of profiles reflected on the purchase order was enough to fill Sunair's production needs for nearly two years, Sunair argues that the quantity ordered could not be considered a "trial order." Assuming, *arguendo,* that Intex was at one time aware that Sunair was interested in a trial order, Sunair does not even allege the necessary facts for the inference that Intex knew how many profiles that Sunair wanted. For example, there is no allegation that Intex was aware of the size of Sunair's operation. Although the order may actually have been a two-year supply. as far as the facts indicate, Intex could have thought that the supply was for two weeks. Sunair might argue that the purchase order was larger than a typical Astrup order. But it would also be reasonable to assume that Sunair (as licensor) had a larger operation than Astrup. Finally, Intex quite reasonably could have thought that Sunair had changed its mind about only wanting a trial order. At least some of the evidence indicates that Sunair did not wish to change extruders, but that its normal extruder, VAW, could not meet its quantity requirements. It would be difficult for Intex to know the exact magnitude of VAW's shortfall.

In any event, it is not clear what duty this prior comment regarding a "trial order," assuming that it even occurred, would place on Intex in the face of the clear purchase order. Sunair was clearly the "least cost avoider" in this situation (it could simply have exercised greater care in drafting its purchase order). *See Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.,* 185 F.3d 732, 743 (7th Cir.1999) (explaining that rules should be set to impose contractual liability on the party who is the "least

cost avoider" – that is, the party who can avoid the mistake at the lowest price). We will not place a duty of clairvoyance on Intex regarding Sunair's true intentions.

## B. The Quality of the Profiles Delivered

■ At trial, Sunair identified many respects in which the profiles allegedly did not conform to the specifications of the contract. In its appeal, Sunair asserts that the district court erred in only one respect by determining that the quality of the profiles conformed to the terms of the contract. According to Sunair, the contract required Intex to extrude the profiles in a stronger form of the 6063 aluminum alloy than it did.

The district court determined that Intex had never promised to change the alloy and that Sunair was not led to believe that it had changed the alloy at the time the purchase order was issued. These determinations constitute findings of fact that this court may overturn only if they are clearly erroneous.

Neither the Intex price list nor the Sunair purchase order specified the alloy that was to be used. The only information that Intex had to manufacture the profiles was from its previous manufacture of profiles for Astrup. It is true that Sunair had expressed dissatisfaction regarding the tensile strength of Intex's alloy. It is also true that Intex felt that it needed a stronger alloy to maintain its certification from TUV, a private organization that tests the performance of building products. Yet Sunair has not pointed us to, and we cannot find in the record, evidence of any direct Intex promise to improve the alloy over that typically provided to Astrup.

We arrive at this conclusion by examining some shreds of evidence that, Sunair argues, indicate such a promise. In a February 26, 1997 memorandum, an official at Astrup told Olof Martenson, President of Sunair, that "Intex agreed to adjust the billet specs used to manufacture our Solair extrusions to fall in line with VAW's and increase their tube wall thickness and outside dimensions to match VAW's also." The obvious hearsay problems with using the statement as evidence of the promise aside, the statement does not even on its own terms make Sunair's case. The memorandum seems to indicate that Intex did change the billet for Astrup, delivered the new materials, and that those materials were determined to meet Astrup's specifications. There is no evidence that Sunair did not receive the same alloy as Astrup had at the time of the memorandum. This would appear to be a satisfaction of the promise contained in the memorandum, to the extent that it is admissible at all.

The only other evidence of a promised improvement in the alloy is through the testimony of Martenson, who claimed that Intex had promised a stronger alloy. Intex officials deny having made such a promise. The district court made a factual finding that no such promise was made, and we have no basis to find the district court's weighing of the credibility of these witnesses clearly erroneous. The provision of profiles identical to those consistently delivered to Astrup conformed to the specifications of the contract. Although Sunair had expressed dissatisfaction with the alloy that Intex had delivered to Astrup in the past, without further specification of the alloy, it was reasonable for Intex to believe that Sunair had settled for the Astrup alloy given that VAW could not meet Sunair's immediate quantity requirements.

## III

The quantity and quantity of the profiles that Intex delivered to Sunair conformed

to the specifications of the contract. Therefore, we AFFIRM the district court's bench trial determination that Sunair was not entitled to reject delivery and is contractually obligated to pay the full purchase price.